# EXHIBIT A
## Part 1

EXHIBIT A

1    JEFFREY A. ROSENFELD (SBN 136896)
     SEAN R. CRAIN (SBN 291515)
2    **ALSTON & BIRD LLP**
     333 South Hope Street, Sixteenth Floor
3    Los Angeles, CA 90071
     Telephone: (213) 576-1000
4    Facsimile: (213) 576-1100
     E-mail:    jeffrey.rosenfeld@alston.com
5             sean.crain@alston.com

6    Attorneys for Plaintiff
7    **INNOVATIVE FUND I, L.P., by and through**
     **INNOVATIVE FUND PARTNERS, LLC, solely in its capacity as attorney-in-fact**

8

9                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                      **FOR THE COUNTY OF ORANGE**    Assigned for all Purposes:

11                                          Judge Walter Schwarm

12    INNOVATIVE FUND I, L.P., by and through      **Case No.:** 30-2020-01153215-CU-BC-CJC
     INNOVATIVE FUND PARTNERS, LLC, solely
13    in its capacity as attorney-in-fact,

14            Plaintiff,                  **COMPLAINT FOR:**

15        v.                         **(1) BREACH OF CONTRACT;**
                                      **(2) PROFESSIONAL NEGLIGENCE;**
16    THE NOTTINGHAM COMPANY, INC.;        **(3) NEGLIGENT MISREPRESENTATION; AND**
     SANVILLE & COMPANY; and DOES 1-50,      **(4) UNFAIR AND DECEPTIVE TRADE**
17    inclusive,                                     **PRACTICES (N.C. GEN. STAT. § 75-1.1);**

18            Defendants.

19                                    **JURY TRIAL DEMANDED**

20

21

22

23

24

25

26

27

28

Plaintiff Innovative Fund I, L.P., by and through Innovative Fund Partners, LLC, solely in its capacity as attorney-in-fact (**"Plaintiff," "Innovative,"** or the **"Fund"**), alleges as follows, on personal knowledge as to itself and its own acts, and on information and belief as to all other matters, for its complaint against The Nottingham Company (**"Nottingham"**) and Sanville & Co. (**"Sanville"**; collectively, **"Defendants"**):

## NATURE OF THIS ACTION

1.      This action seeks money damages against Defendants, who breached their professional and contractual obligations to Plaintiff, as its fund administrator and auditor, respectfully, thereby allowing third parties to defraud Plaintiff and to misappropriate its investment capital.

## THE PARTIES

2.      Plaintiff Innovative Fund 1, LP, is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in Newport Beach, California. Innovative Fund Partners, LLC, a limited liability company organized under the laws of the State of Delaware (the "**General Partner**"), is the general partner of the Fund.  Scott Parent (**"Parent"**) is the sole managing member of the General Partner.

3.      Defendant The Nottingham Company, Inc. (**"Nottingham"**) is a North Carolina corporation with a principal place of business at 116 South Franklin Street, Rocky Mount, NC 27804. Nottingham served as administrator for the Fund throughout 2016.

4.      Defendant Sanville & Company (**"Sanville"**) is a Pennsylvania company with a principal place of business at 1514 Old York Road, Abington, PA 19001.  Sanville served as the Fund's auditor and tax preparer for 2016 and 2017, and it audited the Fund's 2016 and 2017 year-end financial statements.

5.      The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 50 are presently unknown.  The Fund therefore sues these defendants by fictitious names.  The Fund is informed and believes, and on that basis alleges, that DOES 1 through 50 are in some manner responsible for the damages suffered by Plaintiff as alleged herein.  Plaintiff will amend this Complaint to identify the true names and capacities of the fictitiously named defendants when they have been ascertained.

6. This Court has jurisdiction over Defendants because they have voluntarily availed themselves of the jurisdiction of this State by engaging in business in California and through their specific involvement with the acts that give rise to the claims asserted herein.

7. Venue is proper in this judicial district because, among other reasons, Plaintiff was injured in this Court's jurisdictional area, and none of the Defendants reside in the State (or the county in which they reside is unknown to Plaintiff).

8. This is an "unlimited civil case" because Plaintiff seeks damages of more than $25,000, exclusive of attorneys' fees, interest, and costs.

**FACTUAL BACKGROUND**

**A. Scott Parent, George Heckler and the Formation of the Fund**

9. Parent is the founding partner of Innovative Capital Management and its proprietary long/short equity hedge fund, where he has continuously served as the fund's Chief Portfolio Manager since the fund's inception in 2001. Since December 2015, Parent has also been responsible for the day-to-day operations of the Fund, through his position as the managing member of Innovative Fund Partners, LLC, which serves as the Fund's General Partner.

10. In 2001, Parent was introduced to George Heckler. At that time, Parent knew Heckler to be an investor involved in a hedge fund trading strategy called "first-loss trading." Like many traditional hedge funds, first-loss funds utilize third-party investment managers, who are given discretion to invest the fund's assets, consistent with the fund's investment objectives. Unlike traditional hedge funds, the investment managers for first-loss hedge funds (also known as "traders") are required to contribute a significant amount of the fund's overall capital (often 10%), with the remainder of the capital coming from the fund's investors. If the fund experiences a loss, the loss is covered first by the trader's contribution (thus, the term "first loss"), before impacting the capital of the fund's investors. If the fund experiences a gain, the trader gets to share in the profits – at a percentage higher than the fund's investors and higher than the standard industry cut for investment managers of traditional hedge funds.

11. Thus, because the trader for first-loss hedge funds will take the loss on the first 10% of

the fund's capital, the remainder of the fund's capital – and, therefore, the investors' contributions – is better-protected from potential loss. This feature makes first-loss investments less risky for investors than traditional hedge fund investments.

12. After meeting Heckler in 2001, Parent began trading for several first-loss funds that Heckler launched. During the time that Parent worked with Heckler and/or his funds, Heckler had a good reputation in the alternative investment industry, and he appeared to have access to good traders and investments.

13. During the time that Parent has known Heckler, he has founded, owned and/or controlled various different investment vehicles and other entities, which Heckler utilizes for various purposes, including making and managing his various investments. On information and belief, Heckler is the sole member, employee and/or stakeholder in most, if not all, of these entities, and he uses these entities as a mere instrumentality of himself.

**B. The Fund Invests in TA1 and Hires Defendants as Service Providers.**

14. In December 2015, following extensive planning, including discussions with George Heckler, Brenda Smith, and others, Parent decided to launch the Fund, and to deploy the Fund's capital by making several investments over time with entities owned and controlled by Brenda Smith and George Heckler. Innovative did not know – and could not have discovered, despite its reasonable diligence – that during this entire time period, Ms. Smith and Mr. Heckler were actively working against the Fund's interests in order to benefit themselves, the entities they owned and controlled, and/or their earlier investors. Had the Fund been made aware of this important fact, it would not have invested its capital with these entities.

15. On or about December 15, 2015, the Fund made its first capital deployment, by investing $5,000,000 into TA1, LLC (**"TA1"**) – an entity owned by Brenda Smith and controlled by Ms. Smith and Mr. Heckler – via a participation agreement, dated December 15, 2015, by and between the Fund and TA1 (the **"Participation Agreement"**).[1] A true and accurate copy of the Participation

---

[1] Heckler represented to Parent that TA1 was owned by Heckler and Jeffrey Bydalek. In reality, TA1 was owned and controlled by Brenda Smith – a fact that was never disclosed to the Fund by Heckler or TA1 in connection with the investment. 32. The Fund is informed and believes, and on that basis alleges, that near Brenda Smith agreed to allow Heckler to use TA1 as an investment vehicle through

Agreement is attached hereto as **Exhibit A**.

16.     Pursuant to the Participation Agreement, TA1 agreed to invest the Fund's $5,000,000 in a dividend recapture trade strategy, sometimes referenced as a "Skate Trade." This trading strategy employs a combination of investing in securities and options on both a long (i.e., buying/call) and short (i.e., selling/put) basis (the **"Trade"**). These options are timed to capture a stock's dividend, and the buy/sell options are intended to offset each other, allowing for liquidation of the position in the stock a few days after capturing the dividend. Simply put, the strategy was intended to capture dividends with low risk and high liquidity. Importantly, TA1 agreed to utilize the Fund's capital "solely for the Trade," meaning it was to be invested exclusively into publicly traded equities and options.

17.     It is now apparent, however, that TA1 did not invest Plaintiff's funds into publicly traded equities and options, as represented, or in any investment intended to benefit Plaintiff, but instead used Plaintiff's funds to pay earlier investors and divert monies to entities controlled by Ms. Smith and/or Mr. Heckler, and to other places not yet known. On information and belief, the Fund's investment, including its initial $5,000,000 contribution, was immediately transferred to earlier investors in TA1 and other entities owned or controlled by Ms. Smith and/or Mr. Heckler.

18.     Nevertheless, each month, TA1 provided to Innovative (and/or to its fund administrator) reports that falsely reported the value of the Fund's TA1 investment (the **"TA1 Reports"**), misrepresenting that the investment was generating positive returns when, in fact, it had been misappropriated and was being used for other purposes. During the months of December 2015 through December 2016, these TA1 Reports were prepared by CV Fund Administration, LLC (**"CV Fund Admin"**), another entity owned and controlled by Brenda Smith.

19.     Shortly after the Fund launched, Heckler and Smith approached Mr. Parent to recommend service providers for the Fund – companies with which they had prior relationships.

---

which his first-loss traders would implement the Skate Trade. As part of this agreement, TA1 (via Smith) authorized Heckler to represent to investors like the Fund that TA1 was owned by Heckler and Bydalek, and/or that they were agents of TA1, with authority to act on its behalf. At the time of this agreement, Smith hoped to retain a big portion of the returns promised by Heckler in connection with the Skate Trade, for herself and for TA1.

Together, they recommended Nottingham as the Fund's administrator and Sanville as its auditor and tax preparer, because they claimed both entities were familiar with the trading strategy that TA1 would employ due to their prior engagement as the fund administrator and auditor, respectively, for other investment vehicles that implemented the same trading strategy – including Broad Reach Capital, LP (**"BRC"**), another entity controlled by Brenda Smith.

20.     Mr. Parent agreed with these recommendations, believing that the prior experience of Nottingham and Sanville uniquely qualified them for these important service provider positions for the Fund.  It is now apparent, however, that Ms. Smith and Mr. Heckler recommended Nottingham and Sanville because they knew from past experience that these "independent" service providers would help facilitate their ongoing scheme – either by knowingly reporting false information to Innovative or by blindly accepting and passing along whatever information Ms. Smith and/or Mr. Heckler reported to them, no questions asked.  That is precisely what happened here.

21.     On or about February 1, 2016, the Fund hired Nottingham as its fund administrator. Nottingham agreed to provide accounting, recordkeeping, financial reporting and other administration services for the Fund and to report related financial information directly to the Fund and its investors. Nottingham provided these services to the Fund and its investors through at least the end of 2016.

22.     On or about December 7, 2016, the Fund hired Sanville to serve as its auditor and tax preparer.  Sanville agreed to audit the Fund's 2016 and 2017 year-end financial statements, in accordance with the auditing standards generally accepted in the United States of America (**"GAAS"**), and to express an opinion about whether those financial statements are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles (**"GAAP"**).  Sanville provided these services from 2016 to 2018, and it issued clean, unqualified audit opinions concerning the Fund's 2016 and 2017 year-end financial statements.

**C.     Complaints Filed by the U.S. Department of Justice and Securities Exchange Commission Reveal Brenda Smith's Fraud at BRC.**

23.     Around the same time that Mr. Parent launched Innovative, Brenda Smith launched BRC, presumably as another fund in which to implement her trading strategy.  BRC hired Nottingham as its fund administrator and Sanville as its auditor – both of which served in those capacities from at

least 2016 through 2018.

24.    In August 2019, the federal government, together with one of BRC's investors, Surefire Dividend Capture, LP (**"Surefire"**), uncovered the massive securities fraud that Brenda Smith was operating through BRC.   On August 27, 2019, Ms. Smith was arrested by the Federal Bureau of Investigation and charged by criminal complaint with four counts of wire fraud and one count of securities fraud in connection with BRC.  *See* Criminal Complaint, Mag. No. 19-3377 (D.N.J) (**"DOJ Complaint"**), a true and correct copy of which is attached hereto as **Exhibit B.**

25.    The Department of Justice (**"DOJ"**) alleges that Ms. Smith orchestrated a scheme using BRC, in which she lied to investors about the assets and performance of the fund and falsely stated that she would invest their funds in particular trading strategies.   According to the DOJ, Smith collected more than $100 million in capital from investors at BRC, based on her "promise[s] that she would invest their funds in particular trading strategies that [BRC] was allegedly optimally situated to execute." *Id.*, Attachment B ¶ 2.  But instead of investing the money as she promised, she diverted millions of dollars of investor funds out of BRC for other purposes, including paying other investors. BRC, through Nottingham and Sanville, consistently reported positive returns to investors and prospective investors that did not accurately reflect its performance. When confronted with redemption requests by several large investors in BRC, Smith failed to honor the redemption requests and lied about the status of their investment and the fund. *See id.*, Attachment B.

26.    Surefire's complaint against BRC provides more detailed allegations, based on the documents it obtained via arbitration from BRC and its third-party service providers.   According to Surefire, Smith and BRC represented to prospective investors that BRC would employ a strategy intended to capture dividends with low risk and high liquidity and that BRC would be fully invested in publicly traded equities and options utilizing various long and short trading strategies.  *See* Complaint ¶¶ 25-33, 168, *Surefire Dividend Capture LP v. Brenda Smith et al.*, Case No. 2:19-cv-04088 (E.D. P.A. Sept. 6, 2019) (**"Surefire Complaint"**), a true and correct copy of which is attached hereto as **Exhibit C**.[2]   Contrary to these representations, BRC was not invested 100% in equities and

---

[2] Plaintiff has omitted the supporting exhibits appended to the Surefire Complaint.

options. Indeed, the periodic account statements produced by BRC's custodian, Industrial and Commercial Bank of China (**"ICBC"**) – together with other documents obtained by Surefire – show that only a tiny fraction of BRC's assets were actually used to trade equities and equity options. *Id.* ¶¶ 159, 164-68. On information and belief, Nottingham and Sanville both had access to this documentation, should have had access to this information, and/or were reckless in not obtaining access to same.

27. Also on August 27, 2019, The Securities and Exchange Commission charged Ms. Smith with operating an investment advisory fraud involving over $100 million in investments. The complaint, filed in federal court in Newark, New Jersey, charged Ms. Smith, BRC, and related entities with violating the anti-fraud provisions of the federal securities laws. *See* Complaint for Violations of the Federal Securities Law, Civil Action No. 2:19-cv-17213-MCA-LDW (**"SEC Complaint"**), a true and accurate copy of which is attached hereto as **<u>Exhibit D</u>**. The SEC seeks disgorgement of ill-gotten gains, prejudgment interest, and civil penalties against the defendants. The court has already granted the SEC's request for an asset freeze and temporary restraining order.

28. The SEC Complaint alleges that Ms. Smith and BRC raised approximately $105 million from approximately 40 investors by representing that she would invest their money in publicly traded securities through various trading strategies that she championed as providing consistent high returns. *See id.* ¶¶ 4-5. However, Smith made very few investments in these trading strategies, and instead largely used investors' money to repay other investors and for her own personal investments. Indeed, although investors contributed approximately $105 million to the Fund, the high point of all brokerage and bank accounts in the name of the Fund and its purported affiliates was no more than $31.8 million in December 2016. *Id.* ¶ 26. On information and belief, Nottingham and Sanville both had access to documentation showing this discrepancy, should have had access to documentation showing this discrepancy, or they were reckless in not obtaining access to same. The SEC alleges that Smith, and the entities she controls, also disseminated false statements touting positive returns and fabricated documents in an attempt to inflate BRC's assets and lull her investors into believing their capital is safe. *Id.* ¶ 5.

**D. Nottingham & Sanville Knew of Ms. Smith's Malfeasance at BRC**

29. On information and belief, Nottingham and Sanville served as BRC's fund administrator and auditor, respectively, during the entire time this fraud was being perpetrated – and, at the very least, from 2016 through 2018. In these positions, they had access to BRC's brokerage and bank accounts and other sources demonstrating the true financial condition of BRC and, thus, were aware of glaring discrepancies between BRC's actual financial condition and the fiction that BRC was reporting. These same documents also demonstrated to Nottingham and Sanville that only a small percentage of BRC's assets were invested in public equities and options, even though BRC represented to investors that it would invest all of their funds into those asset classes.

30. Therefore, Nottingham and Sanville either knew or should have known – based on their independent review of BRC's underlying financial records, including trading records and account statements – or they were reckless in not knowing, that: (i) BRC was not following the investment objectives, strategies and methods represented to investors; (ii) the bulk of BRC's assets were moved to other accounts and/or treated inconsistently with BRC's disclosed investment objectives, strategies and methods; (iii) BRC did not offer monthly liquidity to investors; and (iv) Brenda Smith and her associates were not investors in BRC, as they represented.

**E. Nottingham Assisted TA1's Fraud by Failing to Serve Its Agreed-Upon Function.**

31. Nottingham agreed to serve as the Fund's administrator, via an Administrative Services Agreement dated February 1, 2016 (the **"Nottingham ASA"**), a true and correct copy of which is attached hereto as **Exhibit E.**

32. In its capacity as administrator for the Fund, Nottingham agreed to perform the following services for the Fund (among others):

  a. Prepare the Fund's books and records, and perform other related accounting services, in conformity with applicable professional accounting and financial reporting standards;

  b. Verify and document the transactions undertaken by the Fund;

  c. Calculate the Fund's net asset value ("NAV") and its performance rates of return on a monthly basis, and allocate those returns via individual partner allocations;

d.      Prepare investor capital statements on a monthly basis (and deliver those statements directly to Fund investors/to be delivered to Fund investors);

e.      Compile the Fund's NAV reports, performance reports, investor capital reports, and trial balance and general ledger reports on at least a monthly basis;

f.      Communicate the monthly financial results of the Fund, and each investor's capital account information, directly to investors; and

g.      Coordinate with the Fund's auditors in connection with the Fund's yearly audits.

Nottingham did not comply with the professional duties it owed the Fund when providing these services.

33.      During the time Nottingham served as administrator (month-end January 2016 through 2016 year-end), the Fund's primary investment was its $5,000,000 investment in TA1 via the participation agreement. Based on discussions between Mr. Parent, Kip Meadows (CEO of Nottingham), Ryan Hale (Nottingham), Mr. Heckler and Ms. Smith, held during January 2016, the Fund and Nottingham agreed that Nottingham would fulfill its month-end contractual responsibilities using the following month-end process: Nottingham would have access to the Fund's bank and brokerage accounts, held at PNC Bank and ICBC, respectively; Ms. Smith (either personally or through CV Fund Admin) would perform the initial calculations on the Fund's TA1 investment, as she was in the best position to do so; each month, she (or CV Fund Admin) would provide to Nottingham the TA1 Reports containing those calculations; Nottingham would review the TA1 Reports, together with the Fund's bank and brokerage account activity, and perform any necessary reconciliations to verify that the TA1 calculations were performed correctly and accurately; after verifying the calculations in the TA1 Reports, Nottingham would incorporate those numbers into month-end reports, including capital statements with allocations to individual partners.

34.      Contrary to this agreement, Nottingham did not perform any substantive review of the TA1 Reports or take any steps to verify the information TA1 reported therein. Instead, it simply incorporated the numbers provided by TA1 into the Fund's month-end reports, accepting Brenda Smith's representations without any questions and simply rubber-stamping her reports, despite its knowledge that she was issuing false reports in connection with BRC at this very same time.

35.     Nottingham specifically agreed to communicate financial information about TA1 to the Fund and to report financial information about the Fund directly to the Fund and its investors. Nottingham was obligated to monitor the integrity of the information it passed on to the Fund and its investors and to communicate that information with due care and in good faith.

36.     The Fund's NAV, which was to be independently calculated and reported to the Fund and its investors by Nottingham, was fundamental to an objective valuation of the Fund. The Fund relied on Nottingham to fulfill its professional accounting and administrative duties when communicating NAV-related information to it and its investors. Nottingham abandoned its fundamental duties by knowingly passing along suspect information to the Fund and its investors about the status of the Fund's TA1 investment and investors' capital accounts, without taking any steps to verify or test the accuracy of that information.

37.     Nottingham did not comply with the professional duties it owed the Fund, and it failed to take basic, reasonable, and industry-standard steps to fulfill its duties as administrator of and accountant for the Fund.  Its failures in this regard include, but are not limited to:  failing to document or confirm the existence of the Fund's investment in TA1; reporting out Fund performance numbers that were inconsistent with its own records; accepting Ms. Smith's reports at face value, despite its knowledge that she was actively engaged in a fraud at BRC; failing to prepare monthly reports and investor statements in accordance with requisite accounting and financial reporting standards; and failing to qualify information provided to the Fund and/or its investors that otherwise appeared unqualified.

38.     In addition, on information and belief, Ms. Smith did not provide Nottingham with access to TA1's trading activity, despite the fact that professional and industry standards impose on fund administrators like Nottingham a duty to scrutinize independently the information relating to the Fund's NAV and account balances, and despite the fact that Nottingham expressly agreed to do this by agreeing to review the TA1 Reports to confirm the figures reported by Brenda Smith.

39.     If Nottingham had refused to rely on the phony information transmitted by Ms. Smith, or if Nottingham had followed professional fund administration and accounting standards with respect to its work for the Fund, or if Nottingham had otherwise alerted Innovative to Ms. Smith's fraud,

Plaintiff would have redeemed its investment out of TA1, and it would not have made subsequent investments to TA1 or to other entities controlled by Brenda Smith or George Heckler.

40.     Instead, Nottingham helped Brenda Smith – whether knowingly or negligently – cover up losses at TA1 and BRC, to Plaintiff's detriment.

### F. Sanville Assisted TA1's Fraud by Failing to Fulfill Its Contractual and Professional Obligations.

41.     Sanville agreed to serve as the Fund's auditor and tax preparer for the years 2016 and 2017 via separate engagement letters, both dated December 7, 2016 (collectively, the **"Engagement Letters"**).  True and correct copies of the Engagement Letters are attached hereto collectively as **Exhibit F**.  In that capacity, Sanville agreed to "audit the [Fund's] statement of assets, liabilities and partners' capital, including the schedule of investments as of December 31, 2016, and the related statements of operations and changes in partners' capital for the year then ended, and the related notes to the financial statements (the **"2016 Financial Statements"**), as well as the Fund's 2017 year-end financial statements (the **"2017 Financial Statements"**; together with the 2016 Financial Statements, collectively, the **"Audited Financial Statements"**).

42.     In its capacity as the Fund's auditor, Sanville undertook professional and contractual obligations to:

a.     Conduct its audits in accordance with GAAS and to perform tests of the Fund's accounting records and other procedures Sanville considers necessary to enable it to express its audit opinion;

b.     Perform audit procedures in line with industry standards, including tests of documentary evidence supporting the transactions recorded in the Fund's accounts and direct confirmation of certain assets and liabilities;

c.     Plan and perform its audits to obtain reasonable assurance about whether the Fund's financial statements are free from material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violation of laws or governmental regulations; and, ultimately

d.     Express an opinion about whether the Fund's financial statements are fairly

COMPLAINT

presented, in all material respects, in conformity with U.S. GAAP.

43. Sanville did not comply with these obligations – particularly its obligation to obtain reasonable assurance about whether the Fund's financial statements are free from material misstatement, in accordance with GAAS. If Sanville had tested the documentary evidence supporting the Fund's transactions, or if it had sought to directly confirm the TA1 investment, it would have discovered material misstatements concerning the TA1 investment.

44. Sanville specifically agreed plan and perform an audit in conformity with GAAS in order to express an opinion about whether the Fund's financial statements are fairly presented, in all material respects, in conformity with GAAP, and to communicate that opinion directly to the Fund and its investors. The Fund's financial statements, with auditor sign-off from CPA professionals, are fundamental to an objective evaluation of the Fund's performance and operations. The Fund and its investors relied on Sanville to perform its audit and to communicate the results thereof with due care and in accordance with applicable professional standards. Sanville abandoned its fundamental duties by knowingly passing along suspect information to the Fund and its investors about the status of the Fund's TA1 investment, among other things, without taking any steps to verify or test the accuracy of that information in accordance with GAAS and other applicable industry standards.

45. Indeed, the documentary evidence in Sanville's possession, which Plaintiff obtained via a demand for Sanville's records, disclosed significant discrepancies in the reported value of the Fund's TA1 investment. As an example, schedules supporting BRC's 2016 financial statements indicated that TA1's equity it its brokerage account was $18,482,968. However, schedules supporting 2016 financial statements for two of Sanville's other audit clients – Innovative and Prophecy Alpha Fund – indicated that those entities had invested a total of over $26 million into TA1. Thus, these reports disclosed at least $7.5 million in contributions to TA1 that were not accounted for in 2016. GAAS requires auditors to test the documentary evidence supporting the amounts and transactions reflected in their clients' year-end financial statements, including obtaining direct confirmations of assets in many instances. These tests, if performed, would have revealed this discrepancy to Sanville, yet it did nothing to reconcile this difference or to otherwise verify the value of the Fund's TA1 investment.

46.     On information and belief, Ms. Smith did not provide Sanville with access to TA1's trading activity, despite the fact that professional and industry standards impose on auditors a duty to scrutinize and confirm independently the information reported in a fund's financial statements.

47.     If Sanville had followed GAAS and other applicable accounting standards with respect to its work for the Fund, or if it had otherwise alerted Innovative to Ms. Smith's fraud, Plaintiff would have redeemed its investment out of TA1, and it would not have made subsequent investments to TA1 or to other entities controlled by Brenda Smith or George Heckler.

48.     Instead, Sanville helped Brenda Smith – whether knowingly or negligently – cover up losses at TA1 and BRC, to Plaintiff's detriment.

**G.  Additional Information Regarding the Fund's Investments**

49.     For reasons unrelated to the allegations in this complaint, Innovative decided to replace Nottingham with a different administrator, beginning in January 2017.

50.     On April 20, 2017, the Participation Agreement was converted to a loan agreement, at 12% annual interest.  On that date, TA1 (as borrower) and the Fund (as lender) entered into a written loan agreement for a line of credit, entitled Revolving Line of Credit Note for up to $10,000,000 (the **"TA1 Note"**), with an effective date of February 1, 2017, and a maturity date of December 31, 2017. Under the TA1 Note, among other things, TA1 agreed to repay the Fund's principal on or before December 31, 2017, together with 12% interest.

51.     On January 1, 2018, the TA1 Note was converted to a new line of credit Note, with School Street (another entity controlled by George Heckler) replacing TA1 as the borrower on the TA1 Note.  On January 1, 2018, School Street (as borrower) and the Fund (as lender), entered into a written loan agreement, entitled Revolving Line of Credit Note (the **"School Street Note"**).  The School Street Note replaced the TA1 Note, such that "the signatories who are party to the [TA1 Note] shall have no further obligation under the [TA1 Note]."  When this occurred, all the money advanced by the Fund to TA1 should have been transferred to School Street for the Fund's benefit.  Innovative is informed and believes, and on that basis alleges, that the money it advanced to TA1 was never transferred to School Street.

52.     Specifically, the Fund made a contribution of $5.6 million to TA1 on December 21,

2015; a withdrawal of $1.5 million from TA1 on May 12, 2016; a contribution of $4.5 million to TA1 on July 14, 2016; and a contribution of $730,000 to School Street on September 17, 2018.

53. In total, the Fund advanced $9,330,000 to TA1 and School Street – via the Participation Agreement, the TA1 Note, and the School Street Note. The Fund advanced this entire amount for the sole purpose of reinvesting the money via the Trade or other investments intended to maximize returns, consistent with the Fund's investment strategy. The Fund has made multiple demands for repayment of this money but, as of the filing of this Complaint, TAI (and/or School Street) has not cured its defaults, or paid the amount owed, or honored its other obligations under the Participation Agreement, the TA1 Note, and/or the School Street Note.

54. On January 1, 2017, the Fund (as lender) entered into a written loan agreement, entitled Revolving Line of Credit Note, with CVAF 1, LLC (**"CVAF"**), an entity controlled by George Heckler (the **"CVAF Note"**). Under the CVAF Note, the Fund agreed to advance to CVAF up to $5,000,000 for reinvestment via the Trade, and CVAF agreed to repay the advances on or before December 31, 2017, together with "interest thereon at 10% plus any additional amount due that has been negotiated by the parties."

55. The CVAF Note was revised via written agreement, dated January 1, 2018. Under the revised terms of the CVAF Note, the face value of CVAF's revolving line of credit was increased to $20,000,000; interest on the loaned amount began to accrue at 12% per annum, compounded annually; and the maturity date was extended to December 31, 2018.

56. Specifically, the Fund made the following contributions to CVAF: $5 million on January 1, 2017; $550,000 on March 1, 2017; $1.45 million on April 1, 2017; $1 million on August 1, 2017; $3.5 million on November 1, 2017; $2.5 million on December 1, 2017; $300,000 on February 20, 2018; and $2.5 million on June 6, 2018.

57. In total, the Fund advanced $16,800,000 to CVAF pursuant to the CVAF Note, for the sole purpose of reinvesting the money via the Trade or other investments intended to maximize returns, consistent with the Fund's investment strategy. Instead, Heckler and CVAF misappropriated this money for their own purposes, including to pay earlier investors. The Fund has made multiple demands for repayment of this money, but, as of the filing of this Complaint, CVAF has not cured its

defaults, or paid the amount owed, or honored its other obligations under the CVAF Note.

58.     If Nottingham and/or Sanville had performed their services for the Fund in accordance with industry standard best practices, Innovative would have been alerted to the fraud being conducted by Brenda Smith, George Heckler and the entities they controlled much sooner than it was.  In that event, Plaintiff would have been able to avoid, or at least mitigate, its losses because it would have sought to redeem all capital invested into TA1, School Street, and/or CVAF, and it would not have invested any additional funds into these entities or any other entities affiliated with Brenda Smith or George Heckler.  Instead, Nottingham and Sanville allowed this fraud to continue and, as a result, the Fund invested a total of $26,130,000 into these entities, which have refused to repay the Fund's money.

## H. Innovative's Discovery of Defendants' Wrongful Conduct

59.     Plaintiff did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the fraud Brenda Smith was orchestrating at both TA1 and BRC, or the scope of the wrongful conduct of Defendants as alleged herein, until approximately August 27, 2019, when the DOJ and the SEC filed criminal and civil complaints, respectively, against Brenda Smith and BRC, which contained detailed allegations exposing the breadth of the misconduct and bad actors involved in that fraudulent scheme.

60.     Nottingham actively concealed its failure to perform any material due diligence on or monitoring of the Fund's TA1 investment.  Nottingham affirmatively misrepresented that it was performing due diligence and accounting services for the Fund and its investors when, in reality, it was performing virtually no due diligence or review of the TA1 Reports.  Nottingham did all this in the face of Brenda Smith's manifest fraud at both TA1 and BRC.

61.     Sanville actively concealed its failure to perform its audit in accordance with GAAS, including the failure to perform any meaningful tests of documentary evidence supporting the TA1 transactions recorded in the Fund's financial statements, in part, by affirmatively representing that it was performing these required tests.  Sanville did all this in the face of Brenda Smith's manifest fraud at both TA1 and BRC.

62.     The affirmative acts of Nottingham and Sanville alleged herein, including the lack of any material due diligence and the failure to perform their duties and obligations, were inherently self-

concealing and were carried out in a manner that precluded detection.

## COUNT I

### BREACH OF CONTRACT

### (Defendant Sanville)

63. Plaintiff hereby incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

64. As set forth above, and the Fund and Sanville entered into the Engagement Letters, which are valid and enforceable written contracts. Among other things, the Engagement Letters required Sanville to:

    a. Conduct its audits of the Fund's financial statements "in accordance with [GAAS]" and to perform "tests of [the Fund's] accounting records and other procedures [Sanville] consider[s] necessary to enable [it] to express such an opinion";

    b. Perform audit procedures in line with industry standards, including "tests of documentary evidence supporting the transactions recorded in the [Fund's] accounts and direct confirmation of certain assets and liabilities"; and

    c. "[P]lan and perform the audit[s] to obtain reasonable assurance about whether the financial statements are free from material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violation of laws or governmental regulations."

65. Plaintiff did all, or substantially all, of the significant things that the contract required it do or, alternatively, Plaintiff was excused from having to perform its obligations by virtue of Sanville's breach.

66. Any conditions required by the contract for Sanville's performance occurred or, alternatively, the non-occurrence of any condition was waived or excused by Sanville.

67. Sanville breached the contract by, among other things, failing to conduct its audits of the Fund's Audited Financial Statements in accordance with GAAS, which required Sanville to directly confirm certain assets and liabilities and to perform the audit in order to obtain reasonable

assurance about whether the Audited Financial Statements contain any material misstatements, and failing to obtain sufficient and appropriate audit evidence to provide a basis for its audit opinions.

68.     As a direct and proximate result of Sanville's breach, the Fund has suffered damages in an amount to be determined at trial, but not less than $32,664,618 (which represents the combined value of CVAF, TA1, and School Street, including accrued gains and interest).

## COUNT II

### PROFESSIONAL NEGLIGENCE

#### (Defendant Nottingham)

69.     Plaintiff hereby incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

70.     Nottingham is engaged in a skilled profession that requires the application of specialized accounting and financial reporting knowledge, skill and judgment.

71.     Nottingham has a duty to conform to a certain standard of conduct in the exercise of its professional obligations.  Specifically, Nottingham has a duty to exercise the proper degree of knowledge, skill, care, training, experience, and judgment that is required by current good and sound professional procedures and practices in accordance with standards applicable to accountants and administrators providing accounting, recordkeeping and financial reporting services.

72.     Nottingham's actions and inactions, including but not limited to the following, represent a gross departure from these professional standards of care required of Nottingham:

a.     Nottingham did not perform any substantive review of the TA1 Reports or take any steps to verify the information being reported therein.  Instead, it simply incorporated the numbers provided by TA1 and Ms. Smith into the Fund's month-end reports, accepting their representations without any question.

b.     On information and belief, Ms. Smith did not provide Nottingham with access to TA1's trading activity, despite the fact that professional and industry standards impose on fund administrators like Nottingham a duty to scrutinize and verify independently the information relating to the Fund's NAV and account balances.

c. Nottingham abandoned its fundamental duties by knowingly passing along false information to the Fund and its investors about the status of the Fund's TA1 investment and the investors' partner capital accounts; failing to document the existence of the Fund's investment in TA1; reporting out Fund performance numbers that were inconsistent with its own records; and accepting Ms. Smith's reports at face value, despite its knowledge that she was actively engaged in a fraud through the BRC.

d. Nottingham failed to take reasonable steps to calculate the Fund's NAV, to verify the existence and valuation of the Fund's investment in TA1, to prepare monthly investor statements in accordance with requisite accounting standards, to relay accurate information to investors, or to qualify information given to investors that otherwise appeared unqualified.

73. Nottingham knew, should have known, or recklessly disregarded that its reports and statements to the Fund and its investors were the principal means by which the Fund and its investors were able to assess the Fund's NAV and the value of individual investors' accounts, in that there was no other purportedly independently-verified information available to investors and limited partners upon which they could rely. Nottingham was under an affirmative duty to obtain competent evidential material verifying the assets held by the Fund, including those invested with TA1, yet it failed to do so.

74. The Fund would not have remained invested in TA1, and it would not have invested additional monies into TA1, School Street, or CVAF if it had known that the statements Nottingham made were materially false and misleading and/or omitted to state material facts necessary in order to make the statements made – in light of the circumstances under which they were made – not misleading, as detailed above.

75. As a direct and proximate result of Nottingham's gross professional negligence, Plaintiff suffered damages in an amount to be determined at trial, but not less than $32,664,618 (which represents the combined value of CVAF, TA1, and School Street, including accrued gains and interest).

# COUNT III

## NEGLIGENT MISREPRESENTATION

### (Defendant Nottingham)

76.     Plaintiff hereby incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

77.     Each month, Nottingham issued financial reports and account statements to both the Fund and its investors, which contained inflated NAV calculations and account balance information, among other things. It provided these financial reports in the course of its business and profession, for the guidance of the Fund and its investors in their business and financial investment pursuits.

78.     In issuing these statements, Nottingham acted negligently because it knew or had access to information indicating that its statements were not accurate. Nottingham acted negligently by failing to check or verify the information received from Ms. Smith despite a duty to scrutinize independently the information relating to the NAV and account balances. Nottingham's failure to check or verify the information was grossly negligent because it was aware of the red flags surrounding BRC and Ms. Smith's involvement therewith.

79.     Nottingham knew that the Fund would rely upon such reports and statements and would rely upon Nottingham's professional expertise in deciding to invest in TA1, maintain its investments in TA1, and make additional investments in TA1. Specifically, Nottingham knew that the reports issued by it were the principal means by which the Fund and its investors were able to assess the Fund's NAV and the value of individual investors' accounts, in that there was no other purportedly independently-verified information available to the Fund or its investors upon which they could rely.

80.     The Fund did, in fact, justifiably rely on Nottingham's false reports in making these decisions.

81.     As a direct and proximate result of Nottingham's negligent misrepresentation, Plaintiff suffered damages in an amount to be determined at trial, but not less than $32,664,618 (which represents the combined value of CVAF, TA1, and School Street, including accrued gains and interest).

## COUNT IV

## UNFAIR AND DECEPTIVE TRADE PRACTICES

### (Defendant Nottingham)

82.     Plaintiff hereby incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

83.     Nottingham's actions and inactions as described herein, including but not limited to its withholding of material information related to the TA1 Reports and its failure to review same, were unethical and unscrupulous acts that were in or affecting commerce.

84.     Nottingham's actions and inactions as described herein constitute unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.

85.     As a direct and proximate result of Nottingham's unfair or deceptive acts or practices, Plaintiff suffered damages in an amount to be determined at trial, but not less than $32,664,618 (which represents the combined value of CVAF, TA1, and School Street, including accrued gains and interest).

## COUNT V

## PROFESSIONAL NEGLIGENCE

### (Defendant Sanville)

86.     Plaintiff hereby incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

87.     Sanville is engaged in a skilled profession that requires the application of specialized accounting and financial reporting knowledge, skill and judgment.

88.     Sanville has a duty to conform to a certain standard of conduct in the exercise of its professional obligations.  Specifically, Sanville has a duty to exercise the proper degree of knowledge, skill, care, training, experience, and judgment that is required by current good and sound professional procedures and practices in accordance with standards applicable to certified public accountants providing accounting, auditing, and financial reporting services.

89.     Sanville's actions and inactions, including but not limited to the following, represent a gross departure from – and breach of – these professional standards of care required of Sanville:

a.  Sanville did not perform any substantive review, including any direct confirmation, with respect to the Fund's TA1 investment, and it simply accepted the reports provided by Ms. Smith and/or Nottingham regarding that investment's purported performance when performing its audit of the Fund's Audited Financial Statements.

b.  On information and belief, Ms. Smith did not provide Sanville with access to TA1's trading activity, despite the fact that GAAS and other applicable professional and industry standards imposed on Sanville a duty to scrutinize and confirm independently the information reported in the Fund's financial statements.

c.  GAAS required Sanville to test the documentary evidence supporting the amounts and transactions reflected in the Fund's financial statements, including obtaining direct confirmations of assets in many instances. These tests, if performed, would have revealed to Sanville glaring discrepancies that, in turn, would have revealed TA1 and Brenda Smith's ongoing fraud. Yet, Sanville issued unqualified audit opinions regarding the Fund's 2016 and 2017 financial statements.

90. Sanville knew, should have known, or recklessly disregarded that its audit opinions to the Fund and its investors were one of the principal means by which the Fund and its investors were able to objectively evaluate assess the Fund's performance, in that they were the only audited source of Fund financial information, providing the Fund and its investors with additional assurance about the status of the Fund's investments. Sanville was under an affirmative duty to obtain competent evidential material verifying the assets held by the Fund, including those invested with TA1, yet it failed to do so.

91. The Fund would not have remained invested in TA1, and it would not have invested additional monies into TA1, School Street, or CVAF if it had known that the audit opinions provided by Sanville were materially false and misleading and/or omitted to state material facts necessary in

order to make the statements made therein – in light of the circumstances under which they were made – not misleading, as detailed above.

A.     As a direct and proximate result of Sanville's gross professional negligence, Plaintiff suffered damages in an amount to be proven at trial, but not less than $32,664,618 (which represents the combined value of CVAF, TA1, and School Street, including accrued gains and interest).

## COUNT VI

### NEGLIGENT MISREPRESENTATION

### (Defendant Sanville)

92.     Plaintiff hereby incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

93.     On August 8, 2017, Sanville issued an Independent Auditor's Report in connection with the Fund's 2016 Financial Statements, which is addressed "To the Partners of Innovative Fund I, LP" (the **"2016 Independent Auditor's Report"**).  On June 29, 2018, Sanville issued an Independent Auditor's Report in connection with the Fund's 2017 Financial Statements, which is also addressed "To the Partners of Innovative Fund I, LP" (the **"2017 Independent Auditor's Report"**; together with the 2016 Independent Auditors Report, collectively, the **"Sanville Audit Reports"**).

94.     The 2016 Independent Auditor's Report and the 2017 Independent Auditor's Report contained material misstatements of fact, including among other things that: (i) the Fund's Audited Financial Statements "present fairly, in all material respects, the financial position of [the Fund] . . . and the results of its operations, changes in partners' capital and cash flows for the year then ended in accordance with [GAAP]"; and (ii) Sanville conducted its audits in accordance with GAAS and performed the audits to obtain reasonable assurance about whether the financial statements were free from material misstatement.  By issuing the Sanville Audit Reports, Sanville intended for the Fund to rely on the information contained therein (including the material misstatements detailed above).

95.     In issuing these statements, Sanville acted negligently – and had no reasonable grounds for believing the information contained therein was true – because it knew it had not conducted its audits in accordance with GAAS, and because it had access to information indicating that its statements were not accurate. Sanville acted negligently by failing to check or verify the information

received from Ms. Smith and/or TAI, despite a duty to scrutinize and verify independently the information relating to the financial statements, as required by GAAS.

96.     Innovative justifiably relied on the information contained in the Sanville Audit Reports. Further, Sanville was paid substantial fees for performing its audit and tax services.

97.     As a direct and proximate result of Sanville's negligent misrepresentations, Plaintiff suffered damages in an amount to be determined at trial, but not less than $32,664,618 (which represents the combined value of CVAF, TA1, and School Street, including accrued gains and interest).

## PRAYER FOR RELIEF

WHEREFORE, Innovative respectfully requests and order and judgment of this Court:

B.     Awarding the Fund all damages incurred by Innovative because of Defendants' activities and conduct alleged herein, in an amount to be determined at trial, but not less than $32,664,618 (which represents the combined value of CVAF, TA1, and School Street, including accrued gains and interest);

C.     Awarding pre-judgment and post-judgment interest on all damages awards;

D.     Awarding costs and reasonable attorneys' fees incurred in connection with this action, to the extent allowable by contract or law;

E.     Imposing a constructive trust on the property wrongfully in possession of Defendants, to compel its transfer to the Fund;

F.     Awarding punitive and exemplary damages to Innovative and against Defendants, in an amount sufficient to punish Defendants for their deceitful, fraudulent, oppressive, malicious, wanton, and intentional misconduct; and

G.     Awarding such additional and further relief as the Court deems just and proper.

DATED: July 29, 2020            JEFFREY A. ROSENFELD
                                SEAN R. CRAIN
                                **ALSTON & BIRD**


                                */s/ Jeffrey A. Rosenfeld*
                                Jeffrey A. Rosenfeld
                                Attorneys for Plaintiff
                                **INNOVATIVE FUND I, L.P.,**
                                **by and through INNOVATIVE FUND PARTNERS, LLC,**
                                **solely in its capacity as attorney-in-fact**


## DEMAND FOR JURY TRIAL

The Fund demands a jury trial for these causes of action where a jury is available.

DATED: July 29, 2020            JEFFREY A. ROSENFELD
                                SEAN R. CRAIN
                                **ALSTON & BIRD**


                                */s/ Jeffrey A. Rosenfeld*
                                Jeffrey A. Rosenfeld
                                Attorneys for Plaintiff
                                **INNOVATIVE FUND I, L.P.,**
                                **by and through INNOVATIVE FUND PARTNERS, LLC,**
                                **solely in its capacity as attorney-in-fact**

# EXHIBIT A

# PARTICIPATION AGREEMENT

**PARTICIPATION AGREEMENT**, dated as of December 15, 2015, by and between TA1, LLC, a Pennsylvania limited liability company ("**Grantor**"), and Innovative Fund 1, LP, a Delaware limited partnership ("**Participant**").

**WHEREAS**, between the date hereof and the opening of the Participant's prime brokerage account at ICBC, Grantor intends to effect an options arbitrage dividend recapture trade by purchasing and selling various securities and/or options (the "Trade") utilizing investment funds from itself and others, including without limitation Participant;

**WHEREAS**, Participant wishes to invest in the Trade by advancing funds to Grantor to be utilized solely for the Trade; and

**WHEREAS**, subject to the terms and conditions hereof, Grantor wishes to participate and sell to Participant a participation interest in and to the Trade;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby grants to Participant as follows:

**Section 1. <u>Grant and Transfer</u>.** Subject to the terms and conditions hereof and effective upon execution hereof, Participant hereby purchases from Grantor, and Grantor hereby irrevocably sells, assigns, conveys and transfers to Participant, a Pro Rata Share (as defined below) of the Trade, including without limitation all rights, title and interest therein and all securities and options purchased or sold in connection therewith (the **"Participated Interest"**, and together with the other rights of Participant hereunder, the **"Participation"**), for a purchase price of $5 million ("**Purchase Price**"). **"Pro Rata Share"** means an undivided interest in the Trade in a percentage amount equal to $5 million divided by the total amount invested in the Trade by all investors in the Trade. Grantor shall use the Purchase Price to effectuate the Trade substantially in the manner described to Participant, which Trade shall be completed and reduced to cash on or before the opening of the Participant's prime brokerage account at ICBC.

**Section 2. <u>Purchase Price</u>.** Grantor acknowledges receipt of the Purchase Price from the Participant by wire transfer for and in consideration of the Participation granted herein.

**Section 3. <u>Representations and Warranties of Grantor</u>.** Grantor represents and warrants to Participant as of the date hereof that:

(a) Grantor is a duly organized corporation under the laws of its jurisdiction of incorporation and is in good standing under such laws. Grantor has full power and authority to execute, deliver and perform its obligations under this Agreement, including all documents executed in connection herewith, and to sell the Participation hereunder.

(b) This Agreement has been duly and validly authorized, executed and delivered by Grantor and is legal, valid, binding and enforceable against Grantor in accordance with its terms.

(c) Grantor has not, directly or indirectly, assigned, transferred, participated, sold, conveyed, disposed of or terminated, in whole or in part, any of its right, title and interest in and to the Participated Interest, except to Participant hereunder, and is not a party to any agreement (other than this Agreement) which would result in any of the foregoing.

1

(d)     Grantor is a sophisticated seller with respect to the Participation and has adequate information to make an informed decision regarding the sale of the Participation and has independently and without reliance upon Participant and based on such information as Grantor has deemed appropriate, made its own analysis and decision to enter into this Agreement.

(e)     The Trade shall be in compliance with all applicable laws, rules and regulations.

**Section 4.     Representations and Warranties of Participant.**     Participant represents and warrants to Grantor as of the date hereof that:

(a)     Participant is a duly organized corporation under the laws of its jurisdiction of incorporation and is in good standing under such laws. Participant has full power and authority to execute, deliver and perform its obligations under this Agreement, including all documents executed in connection herewith, and to purchase the Participation hereunder.

(b)     This Agreement has been duly and validly authorized, executed and delivered by Participant and is legal, valid, binding and enforceable against Participant in accordance with its t e r m s .

(c)     (A) It is a sophisticated buyer with respect to the Participation and has adequate information to make an informed decision regarding the purchase of the Participated Interest and has independently and without reliance upon Grantor and based on such information as Participant has deemed appropriate, made its own analysis and decision to enter into this Agreement; (B) it is purchasing the Participated Interest for investment purposes and not with a view to resale or other distribution; (C) it has such knowledge and experience and has made investments of a similar nature so as to be aware of the risks and uncertainties inherent in purchases of the type contemplated herein; and (D) it is an "accredited investor" as defined in Rule 501(a) of Regulation D under the United States Securities Act of 1933, as amended.

**Section 5.     Transfer of Participation by Participant.**     Participant may not sell, assign, divide, pledge, or otherwise transfer or encumber the Participation, the Participated Interest, or any portion thereof or interest therein, without the prior written consent of Grantor.

**Section 6.     Receipt of Payments, Transparency.**

(a)     *Receipt of Payments.* Whenever Grantor receives or collects cash, other payments, shares, securities or property of any kind in respect of the Trade, it will hold a Pro Rata Share of same in trust for the benefit of Participant and promptly after its receipt or collection thereof pay over such cash, other payment, securities or property to Participant, duly endorsed as appropriate.

(b)     *Documents and Information.* Grantor shall promptly furnish and convey to Participant any and all information and documents requested by Participant in connection with the Trade, including without limitation information and documentation relating to the total amount invested in the Trade and any and all transactions occurring with respect to the Trade and all transfers of cash.

**Section 7.     Indemnifications.** Each party hereto agrees to indemnify, defend and hold harmless the other party hereto and its officers, directors, employees, partners, agents and controlling persons (collectively, "**Indemnitees**") from and against any and all expenses, losses, claims, damages, suits,

2

proceedings and liabilities which are incurred by any Indemnitees, including without limitation reasonable attorneys' fees and expenses (as incurred), caused by, or resulting only from, such party's breach of any of its representations, warranties, agreements or covenants set forth in this Agreement.

### Section 8. <u>Miscellaneous</u>.

(a) *Further Assurances.* Each of the parties hereto shall execute and deliver, or cause to be executed and delivered, all such instruments, and to take all such actions as the other party may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

(b) *Counterpart Execution.* This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but both of which together shall constitute one agreement.

(c) *Governing Law.* This Agreement shall be construed and the obligations of the parties hereunder shall be determined in accordance with the laws of the State of Pennsylvania (without regard to any conflict of laws provisions thereof).

(d) *Integration.* This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, understandings or representations pertaining to the subject matter hereof, whether oral or written. There are no representations, warranties or other agreements between the parties in connection with the subject matter hereof except as specifically set forth herein.

(e) *Confidentiality.* Each party agrees that except as may be requested by a taxing or regulatory authority or required by any financial reporting requirement, or required by law or legal process or by an order, judgment or decree of a court or other governmental authority of competent jurisdiction, it shall not disclose any information relating to the Participation, or the existence of this Agreement, to any person, except for its agents, attorneys, accountants, representatives, employees, officers, partners, affiliates and directors, each of whom shall be advised of the requirements of this Agreement.

IN WITNESS WHEREOF, Grantor and Participant have duly executed and delivered this Agreement as of the date first above written.

**TA1, LLC**

By: _____
Name: *Jeffrey Bydalek*
Title *Managing Member*

**INNOVATIVE FUND 1, LP**

By: _____
Name: Scott Parent
Title Managing member

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. James B. Clark, III |
| | : | |
| v. | : | Mag. No. 19-3377 |
| | : | |
| BRENDA SMITH | : | CRIMINAL COMPLAINT |
| | : | |
| | : | **FILED UNDER SEAL** |

I, Jason Annuziato, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the U.S. Attorney's Office for the District of New Jersey, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Jason Annuziato, Special Agent
U.S. Attorney's Office
District of New Jersey

Sworn to before me and subscribed in my presence,
August 22, 2019, at Newark, New Jersey

_____
HONORABLE JAMES B. CLARK, III
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**Counts 1 through 4**
**(Wire Fraud)**

From at least as early as in or around February 2016 through in or around August 2019, in the District of New Jersey and elsewhere, defendant

**BRENDA SMITH**

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, each constituting a separate count of this Complaint.

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 1 | December 26, 2018 | Interstate wire related to wire transfer of $2,049,000 fraudulently obtained from Victim 1 |
| 2 | December 27, 2018 | Interstate wire related to wire transfer of $236,000 fraudulently obtained from Victim 1 |
| 3 | January 29, 2019 | Interstate wire related to wire transfer of $2,000,000 fraudulently obtained from Victim 1 |
| 4 | January 31, 2019 | Interstate wire related to wire transfer of $225,000 fraudulently obtained from Victim 1 |

In violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.

## Count 5
## (Securities Fraud)

From at least as early as in or around February 2016 through in or around August 2019, in the District of New Jersey and elsewhere,

**BRENDA SMITH**

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchases and sales of securities, to wit, interests in Broad Reach Capital, LP, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, namely, persons with interests in Broad Reach Capital, LP.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

**ATTACHMENT B**

I, Jason Annuziato, am a Special Agent with the U.S. Attorney's Office, District of New Jersey. I have conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation and have knowledge of the following facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. All dates and dollar amounts described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

1.    At all times relevant to this Complaint:

a.    Defendant BRENDA SMITH was a resident of Philadelphia, Pennsylvania. SMITH managed or controlled purported investment funds, including Broad Reach Capital, LP ("Broad Reach Capital"). The general partner of Broad Reach Capital was Broad Reach Partners, LLC, and Broad Reach Capital was managed by Bristol Advisors, LLC. Both Broad Reach Partners, LLC and Bristol Advisors, LLC were owned and controlled by SMITH.

b.    Broad Reach Capital was a pooled investment fund/hedge fund that was established in or around February 2016. Broad Reach Capital was open to accredited investors with a minimum investment of $1 million.

c.    "Victim 1" was a limited partnership investment fund with a principal place of business in Montreal, Canada. Victim 1 was an investor and Limited Partner in Broad Reach Capital.

d.    "Victim 2" was an individual residing in Puerto Rico. Victim 2 controlled investment funds that were investors and Limited Partners in Broad Reach Capital.

e.    "Victim 3" was an individual residing in Florida. Victim 3 controlled a trust that was an investor and Limited Partner in Broad Reach Capital.

f.    "Victim 4" was an individual residing in New York. Victim 4 was an investor and Limited Partner in Broad Reach Capital.

g.    "Victim 5" was an individual residing in Pennsylvania. Victim 5 was an investor and Limited Partner in Broad Reach Capital.

## Overview

2.　From at least as early as in or about February 2016 through in or about August 2019, SMITH orchestrated a fraudulent scheme pursuant to which she made misrepresentations to investors and promised that she would invest their funds in particular trading strategies that Broad Reach Capital was allegedly optimally situated to execute (the "Trading Strategies"). As part of the fraudulent scheme, SMITH collected more than approximately $100 million in investments into Broad Reach Capital. Instead of investing the money as she promised, she diverted millions of dollars of investor funds out of Broad Reach Capital for purposes inconsistent with the Trading Strategies and, in some instances, paid out millions of dollars to other investors. When confronted with redemption requests by several large investors in Broad Reach Capital, SMITH failed to honor the redemption requests and misstated and omitted material facts.

## SMITH Defrauds Victim 1

3.　In or about August 2018, Victim 1 reached out to SMITH to explore investing in Broad Reach Capital. Over the course of several months, SMITH communicated with Victim 1 regarding a potential investment, during which SMITH made misrepresentations to induce Victim 1 to invest in Broad Reach Capital. In addition, SMITH provided written materials to Victim 1 that contained misrepresentations.

4.　For instance, SMITH represented to Victim 1 that Broad Reach Capital was a trade-focused investment fund that employed the Trading Strategies, which included three core strategies: dividend capture, VIX convergence, and opportunistic trading.

5.　SMITH provided written materials, including a "tear sheet" (a one-page summary sheet about Broad Reach Capital), to Victim 1 that mentioned only the Trading Strategies as investments and that contained purported historical performance information. The "tear sheet" included a chart that reflected, among other things, positive monthly returns and claimed annual returns of over 35% in 2016 and over 33% in 2017. According to the chart, 2018 had steady positive monthly returns, including a 1.76% return in February 2018. In reality, however, Broad Reach Capital's brokerage accounts lost over approximately 50% of their value in February 2018.

6.　Moreover, in direct conflict with the brokerage account records, SMITH told Victim 1 that a Broad Reach Capital trader avoided a February 2018 volatility shock and made a huge profit.

7.　SMITH also told Victim 1 that the amount of assets in Broad Reach Capital were tens of millions of dollars higher than they actually were and misrepresented the daily trading volume of the fund.

8.     Based on these misrepresentations and others, as well as SMITH's explanation of the Trading Strategies, Victim 1 invested $4,510,000.

9.     SMITH did not invest Victim 1's money in the Trading Strategies. Instead, as detailed below, SMITH transferred Victim 1's money to non-Broad Reach Capital bank accounts that SMITH controlled and paid other investors with Victim 1's money.

10.     Another Broad Reach Capital investor ("Victim 2") ultimately transferred tens of millions of dollars of its investments in Broach Reach Capital to Victim 1. Victim 1 eventually made a redemption request for more than $46 million, including Victim 1's original investments plus the transferred investments from Victim 2. SMITH failed to pay any portion of the redemption request.

### SMITH Misappropriates Victim 1's December 2018 Investment

11.     On or about December 26, 2018, Victim 1 wired $2,049,000 to Broad Reach Capital to invest in the Trading Strategies. On or about December 27, 2018, Victim 1 wired $236,000 to Broad Reach Capital to invest in the Trading Strategies. Both wire transfers were processed through the Fedwire Funds Service and involved electronic communications between Federal Reserve Bank facilities in New Jersey and Texas.

12.     Prior to the deposits from Victim 1, the balance in the Broad Reach Capital bank account was $948.82.

13.     Two business days later, on or about December 31, 2018, SMITH transferred $1,030,000 from the Broad Reach Capital bank account through two bank accounts that she controlled, ultimately wiring $1,029,150.68 to another investor and Limited Partner of Broad Reach Capital.

14.     Also on or about December 31, 2018, SMITH wired $1,000,000 from the Broad Reach Capital bank account to a commercial real estate company.

15.     The vast majority of Victim 1's December 2018 investment was not traded as promised. Out of the $2,285,000 wired to Broad Reach Capital, at most approximately $32,000 was transferred to a brokerage account.

### SMITH Misappropriates Victim 1's January 2019 Investment

16.     On or about November 29, 2018, an investor and Limited Partner of Broad Reach Capital ("Victim 3") requested redemption in the amount of $2,364,513 from SMITH.

17.     As of on or about January 28, 2019, the balance in the Broad Reach Capital bank account was $73.92.

18. On or about January 29, 2019, Victim 1 wired $2,000,000 to Broad Reach Capital to invest in the Trading Strategies. This wire transfer was processed through the Fedwire Funds Service and involved electronic communications between Federal Reserve Bank facilities in New Jersey and Texas.

19. On that same day, SMITH wired $2,000,000 to Victim 3.

20. On or about January 31, 2019, Victim 1 wired $225,000 to Broad Reach Capital to invest in the Trading Strategies. This wire transfer was processed through the Fedwire Funds Service and involved electronic communications between Federal Reserve Bank facilities in New Jersey and Texas.

21. Between on or about January 29, 2019 through on or about January 31, 2019, an additional $130,000 was deposited into the Broad Reach Capital bank account from at least two other investors and Limited Partners of Broad Reach Capital ("Victim 4" and "Victim 5").

22. On or about January 31, 2019, SMITH transferred $6,000 and $3,500 from an account she controlled into the Broad Reach Capital bank account. These funds, when added to the funds from Victim 1, Victim 4, and Victim 5, totaled $364,500.

23. That same day, on or about January 31, 2019, SMITH wired $364,513 to Victim 3—the remaining amount of Victim 3's requested redemption.

24. In short, none of Victim 1's January 2019 investment was transferred to a Broad Reach Capital brokerage account or otherwise traded. The entirety of Victim 1's funds were instead provided to Victim 3.

### SMITH Fails to Pay Victim 1's Redemption Request

25. Victim 1 ultimately requested the redemption of its investment. SMITH repeatedly failed to pay the redemption and misstated and omitted material facts. SMITH eventually provided a Broad Reach Capital asset list to Victim 1, showing purported assets that were in direct conflict with her representations to investors that Broad Reach Capital employed the Trading Strategies.

26. On or about March 22, 2019, Victim 1 requested that SMITH redeem 100% of Victim 1's capital account with Broad Reach Capital. As stated above, in addition to the December 2018 and January 2019 investments that Victim 1 sent to Broad Reach Capital, in or around February 2019, Victim 2 transferred tens of millions of dollars of investments in Broad Reach Capital to Victim 1.

27.    On or about April 30, 2019, Broad Reach Capital closed Victim 1's capital account. Victim 1's Broad Reach Capital account statement showed that $46,598,676.84 was withdrawn in April 2019, and that as of April 30, 2019, the account had a $0 balance.

28.    SMITH told Victim 1 that the wire for the full redemption amount of $46,598,676.84 (the "Redemption Amount") would be sent on May 15, 2019.

29.    In the days and weeks following the promised redemption date of on or about May 15, 2019, SMITH misstated and omitted material facts while providing a series of shifting excuses and explanations for the lack of redemption.

30.    For example, SMITH told Victim 1 that Broad Reach Capital had invested in long dated option contracts and that liquidating those options to fund the redemption would require her to "take a haircut."

31.    On or about May 31, 2019, SMITH provided Victim 1 with a corporate resolution of CV International Investments Limited, an entity SMITH controls and manages ("CV International"), as proof of funds. The resolution stated that CV International owned medium term notes issued by HSBC Holding PLC with a particular ISIN number (the "HSBC Bond") and that it had transferred $100 million of the HSBC Bond notes to Broad Reach Capital, effective as of December 31, 2017.

32.    SMITH told Victim 1 that she anticipated being able to transmit the funds during the month of June 2019 and would continue to work on increasing liquidity of the HSBC Bond.

33.    SMITH provided Victim 1 with a purported investment statement from HSBC in the name of CV International. The purported investment statement listed the HSBC Bond and showed a balance and "investment value" of $2.5 billion.

34.    A search of public records showed that the HSBC Bond did indeed exist and was issued by HSBC Holdings PLC. The face value of the bond was $2.5 billion. However, records show over approximately 300 holders of the bond—mostly large institutional investors or funds. SMITH, CV International, and Broad Reach Capital were not on the list of holders of the HSBC Bond—and none was the sole holder of the entirety of the HSBC Bond. Indeed, the bond was actively trading.

35.    On or about June 14, 2019, SMITH told Victim 1 that she was going to London early the next week to monetize the HSBC Bond. SMITH stated that she should have liquidity once the instrument was in the London bank as opposed to the Hong Kong bank, which was causing issues with certain transactions because of the time zone difference. SMITH also asked Victim 1 to

keep the fact that she was the owner of the HSBC Bond confidential "for [her] safety."

36.     When Victim 1 asked SMITH why records showed that the HSBC Bond was not owned by Broad Reach Capital or CV International, SMITH responded that she was told that HSBC would either issue additional units when she closed or repurchase units, but it was HSBC's choice.

37.     On or about June 17, 2019, SMITH told Victim 1 that she was working directly with a monetizer overseas on several transactions. She stated that her banker had just informed her of two deliverables in the next 24 hours.

38.     Two days later, on or about June 19, 2019, SMITH told Victim 1 that she was waiting for an email from a banker that was promised that day. She said that goal for the funds and audit was the end of the month, but if the funds came in sooner, she would wire them the same day.

39.     On or about July 3, 2019, Victim 1 received a one-page typed document entitled "Broad Reach Capital LP, Listing of Assets, Valued as of June 30, 2019" (the "Broad Reach Capital Asset List"). According to the Broad Reach Capital Asset List, Broad Reach Capital's total asset value was over $180 million. The vast majority of Broad Reach Capital's assets—over $129 million—were purportedly in the HSBC Bond. This amount was inconsistent with the earlier corporate resolution provided by SMITH and with the publically available records regarding the HSBC Bond.

40.     The other major assets on the Broad Reach Capital Asset List included over $20 million in "Securitized cryptocurrency" and $12 million in "notes receivable." Neither of these assets were securities that were part of the Trading Strategies.     The Broad Reach Capital Asset List showed only approximately $2.6 million in brokerage accounts—a small fraction of what SMITH claimed where the assets of Broad Reach Capital.

41.     As of August 22, 2019, Victim 1 had not received any portion of the $46,598,676.84 Redemption Amount.

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUREFIRE DIVIDEND CAPTURE, LP, | : | **Civil Action No.:** |
| | : | |
| Plaintiff, | : | **Complaint** |
| v. | : | |
| | : | |
| BRENDA SMITH, RENATO ESCOBAR IREGUI, | : | **Jury Trial Demanded** |
| BRISTOL ADVISORS, LLC, CV BROKERAGE, | : | |
| INC., CV INTERNATIONAL INVESTMENTS, | : | |
| LTD., CV INVESTMENTS, LLC, INVESTMENT | : | |
| CONSULTING LLC, WILLIAM THOMAS | : | |
| MCCORMACK, ANTHONY SCOTT | : | |
| KOPENHEFFER, SANVILLE & CO., and THE | : | |
| NOTTINGHAM COMPANY. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**COMPLAINT**

Plaintiff Surefire Dividend Capture, LP ("Surefire") brings this action to recover

its $46,598,676.84 redeemed interest in Broad Reach Capital, LP ("BRC" or the "Fund"), an

allegedly liquid hedge fund controlled by Defendant Brenda Smith ("Ms. Smith") that purported

to invest solely in equities and options trading strategies.  As detailed herein, following the

missed redemption of its investment, Surefire has uncovered a massive securities fraud whereby

Ms. Smith and her Defendant compatriots induced Surefire and its predecessor to invest in the

Fund based on false and misleading representations, including the Fund's strategy, holdings, and

active oversight provided by the "independent" fund administrator, Defendant The Nottingham

Company ("Nottingham"), and independent auditing by Defendant Sanville & Co. ("Sanville").

Ms. Smith has since been arrested on federal charges for securities and wire fraud in connection

with BRC.  Additionally, the Securities and Exchange Commission has sued Ms. Smith, BRC

and several of other entities for securities fraud and frozen their assets and bank accounts.

Based on information uncovered to date, it is apparent that Defendants did not

invest Plaintiff's funds into publicly traded equities and options as represented, or in any

investment intended to benefit Plaintiff, but instead used the funds to pay earlier investors and

divert monies to entities controlled by Ms. Smith and other places yet known.  A centerpiece of

Defendants' scheme was to create and disseminate fictitious account statements of investment

holdings and returns.  But after three years of generating these false investment reports,

Defendants' scheme ultimately collapsed.  In an effort to cover tracks, Ms. Smith told Surefire a

string of fake excuses as to why its redemption had not been paid (*i.e.*, "I am waiting on one

banker acknowledgment…"), and then in June 2019, resorted to falsifying the Fund's holdings,

claiming that the Fund held an HSBC bond allegedly worth $129 million - - when public records

directly show that it does not - - and $20 million worth of "securitized crypto-currency"

evidenced by a "screen shot" of a crypto wallet - - when no such asset exists.  Unlike Ms. Smith,

the bank records do not lie.  Those records show Plaintiff's investments being immediately

transferred to earlier investors and other entities owned/controlled by Ms. Smith.

Surefire asserts claims for fraud, aiding and abetting fraud, aiding and abetting

breach of fiduciary duty, negligent misrepresentation, and conversion, as well as claims under §§

10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j

and 78t(a), and Rules 10b-5(a), (1), and (c), 17 C.F.R. § 240.10b5, promulgated thereunder by

the Securities and Exchange Commission ("SEC"), and 70 P.S. §§ 1-401, 1-501, and 1-503(a) of

the Pennsylvania Securities Act (the "Act").

## PARTIES

1.     Plaintiff Surefire is a limited partnership with a principal place of business at 8360 Rue Bougainville, Montreal, Quebec, Canada.  As described below, Surefire is both a direct investor in the Fund as well as the successor in interest to three related funds.

2.     Defendant Brenda A. Smith is an individual who has a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Upon information and belief, Ms. Smith resides at 222 West Rittenhouse Square, Philadelphia, PA 19103.

3.     Defendant Renato Escobar Iregui ("Mr. Iregui") is an individual who, upon information and belief, resides at 331 East Lytle Street, Murfreesboro, TN 37130.  Mr. Iregui is a director of Broad Reach Capital and Defendant CV International Investments, Ltd. He also is the sole member of a Tennessee entity called Investment Consultants, PLLC ("TN Investment Cons").

4.     Defendant William Thomas McCormack ("Mr. McCormack") is an individual who, at all relevant times, had a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Mr. McCormack is employed by CV Brokerage, Inc.  Upon information and belief, Mr. McCormack resides at 1521 E. Malaga Road, Williamstown, NJ 08094.

5.     Defendant Anthony Scott Koppenheffer ("Mr. Koppenheffer") is an individual who, at all relevant times, had a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Mr. Koppenheffer is employed by CV Brokerage, Inc.  Upon information and belief, Mr. Koppenheffer resides at 2 Twin Oaks Court, Sewell, NJ 08080.

6.      Defendant Bristol Advisors, LLC ("Bristol Advisors" or the "Investment Advisor") is a Delaware limited liability company with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  At all relevant times, Bristol Advisors acted as the investment manager to the Fund pursuant to an agreement between Bristol Advisors and BRC.  Bristol Advisors was owned and controlled by Ms. Smith.

7.      A "Firm Organization Chart" showing the structure of BRC and Bristol Advisors is attached as Exhibit 1.

8.      Defendant CV Investments, LLC ("CV Investments") is a Pennsylvania limited liability company with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  At all relevant times, CV Investments was owned and controlled by Ms. Smith.

9.      Defendant CV International Investments, Ltd. ("CV International") is a United Kingdom private limited company with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.   At all relevant times, CV International was owned and controlled by Ms. Smith.

10.     Defendant CV Brokerage, Inc. ("CV Brokerage") is a Financial Industry Regulatory Authority ("FINRA") registered broker dealer with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Ms. Smith founded CV Brokerage.  At all relevant times, CV Brokerage was owned and controlled by Ms. Smith and Mr. McCormack.

11.     Defendant Investment Consulting LLC ("Investment Cons") is a Pennsylvania limited liability company with a principal place of business at 300 Conshohocken

4

State Road, Suite 200, West Conshohocken, PA 19428.  Upon information and belief,

Investment Cons was owned and controlled by Ms. Smith at all relevant times.

12.     Defendant Sanville & Co. ("Sanville" or the "Auditor") is a Pennsylvania

company with a principal place of business at 1514 Old York Road, Abington, PA 19001.  At all

relevant times, Sanville held itself out as the independent third-party auditor for BRC.

13.     Defendant The Nottingham Company ("Nottingham" or the

"Administrator") is a North Carolina corporation with a principal place of business at 116 South

Franklin Street, Rocky Mount, NC 27804.  At all relevant times, Nottingham held itself out as

the independent third-party administrator for BRC.

## JURISDICTION

14.     This Court has jurisdiction over the subject matter of this action pursuant

to § 27 of the Exchange Act, 15 U.S.C. § 78aa.  The claims asserted herein arise under and

pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules

and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1331.

16.     This Court has supplemental jurisdiction over the pendant state law claims

pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. §§ 1391 (b) and (c) in that many of the acts and transgressions

alleged herein occurred in substantial part in this District.

## FACTS

### Brenda Smith

18.     For decades, Ms. Smith had been recognized and respected in the Philadelphia financial community.  She is a certified public accountant, internal auditor, and international tax specialist with more than twenty-five (25) years of tax and financial management experience at top firms, including Deloitte & Touche LLP.

19.     Ms. Smith also owned a FINRA registered broker/dealer - - CV Brokerage - - and held FINRA Series 7, 24, 27, 53, 63, and 79 licenses.

20.     Ms. Smith also owned seats on both the New York Stock Exchange (NYSE) and the Philadelphia Stock Exchange (PHLX).

### The Genesis and Creation of Broad Reach Capital Partners

21.     Upon information and belief, prior to the creation of BRC, Ms. Smith ran an investment fund known as TA1, LLC ("TA1"), in which she utilized certain options strategies that netted significant returns.

22.     Upon information and belief, the investors in TA1 were friends and family of Ms. Smith.

23.     In early 2016, Ms. Smith determined to open a fund for qualified investors - - named BRC - - ostensibly to replicate her successful TA1 strategies to a larger audience.

24.     In Spring 2016, Ms. Smith began pitching investors to place funds with BRC; the central thesis being that she had gained access to the coveted "dividend capture" trade and had been granted increased capacity to participate in that lucrative options business.  As described herein, Defendants, through marketing materials, tear sheets, private placement memorandums, and multiple due diligence calls, told a consistent and compelling story.

25.     Specifically, the dividend capture trade employs a combination of investing in options on both a long (*i.e.*, buying/call) and short (*i.e.*, selling/put) basis.  These options are timed to capture a stock's dividend.  The buy/sell options are also intended to offset each other, thus, allowing for liquidation of the position in the stock a few days after capturing the dividend.  Simply put, the strategy was intended to capture dividends with low risk and with high liquidity.

**The A Funds' Investment into BRC**

26.     Aalii Fund, LP and Alpha Capital Partners, LP, (collectively, the "A Funds") are investment vehicles.

27.     In multiple pre-investment discussions, both Ms. Smith and Mr. McCormack told the A Funds, through their authorized representative, that the "crown jewel" of BRC's investment strategy, which accounted for approximately thirty-five percent (35%) of the Fund's revenue, was the dividend capture trade.

28.     Ms. Smith and Mr. McCormack further explained that the dividend capture trade generally yielded exceptional returns and had an eighty-five percent (85%) "hit rate" (*i.e.*, approximately 85% of the dividend capture trades made money).

29.     Mr. McCormack further told the A Funds that the dividend capture trade was like an "old boys club," that "you can't participate unless you are invited," and that he and Ms. Smith "ran the club."

30.     This "old boys club" theme was echoed in BRC's promotional materials, including a Trading Strategies Summary (the "Trading Strategies Summary") that Mr. McCormack provided to the A Funds prior to their investment in BRC.  Specifically, the Trading Strategies Summary states that that there is a "material barrier to entry for the dividend trade."

7

31.     A true and accurate copy of the Trading Strategies Summary is attached hereto as Exhibit 2.

32.     Mr. McCormack also told the A Funds that the BRC investment was one-hundred percent (100%) attributed to publicly traded equities and equity options, and that Ms. Smith was personally invested in BRC, resulting in an alignment of interests.

33.     Likewise, Ms. Smith also told the A Funds that one-hundred percent (100%) of BRC's revenue came from the various equities and options trading strategies.  Ms. Smith provided the A Funds with a written "attribution analysis" that broke down BRC's revenues by percentage (the "Attribution Analysis").

34.     The Attribution Analysis provided as follows:

Broad Reach:  Revenue Percentage Break Down as of September 30, 2016

| | | |
|---|---|---|
| - | Dividend trade | 35% |
| - | Volatility skew | 18% |
| - | Vix Spread | 32% |
| - | Intraday Traders | 6% |
| - | Opportunistic Trade | 9% |
| | | 100% |

35.     A true and accurate copy of the Attribution Analysis is attached hereto as Exhibit 3.

36.     As part of those discussions, Ms. Smith provided the A Funds with a slide deck (the "April 4, 2016 Slide Deck") that provided, in relevant part:

    a.     BRC's "Distinctly Different Trading Strategies" for equities and equity options - - specifically, Dividend Trade, Volatility Skew Trade, Vix Options spreads, and Intra-day actively traded equities and options;

    b.     "Liquidity:  Broad Reach Capital maintains a 90 day lock up for new dollars; with liquidity available after 30 days notice on the first of each month;"

      c.      "Independent third party administrator - Nottingham Investment Vehicle Solutions;"

      d.      "Independent third party accounting firm - Sanville & Co.," a "Top 19 Auditor[s] of Hedge Funds;"

      e.      "GIPS compliant data available;"

      f.      "Efficient execution and clearing costs for large volumes of equity and options trading – *CV Brokerage Inc. is an affiliated entity*;" (emphasis added) and,

      g.      BRC maintained a ninety (90) day lock up for new investments with liquidity available after thirty (30) days notice of the first of each month.

37.    A true and accurate copy of the April 4, 2016 Slide Deck is attached hereto as <u>Exhibit 4</u>.

38.    Ms. Smith, Bristol Advisors, and CV Brokerage also provided the A Funds with a Private Placement Memorandum (the "PPM").

39.    A true and accurate copy of the PPM is attached hereto as <u>Exhibit 5</u>.

40.    The PPM describes BRC's principal investment strategy as an "Option Dividend Strategy," (*i.e.*, the dividend capture trade) which employs a combination of "deep in the money" options on both a long (*i.e.*, buying/call) and short (*i.e.*, selling/put) basis. These options were purportedly timed to capture a stock's dividend, and intended to offset each other, allowing BRC to liquidate its position in the stock a few days after capturing the dividend.

41.    The PPM further represented that Nottingham served as the Fund's Administrator providing "certain administrative, accounting and investor services to the Fund."

42.    Specifically, the PPM stated that, "[p]ursuant to the terms of an Administration Agreement between the Fund and the Administrator, the Administrator [was] responsible, under the ultimate supervision of the General Partner, for providing all

administrative services required in connection with the Fund's operations, including: (a)

managing the purchase and redemption process; (b) computing the Net Asset Value of the Fund;

(c) maintaining the register of investors and entering on such all issues, transfers, and redemption

of Interests in the Fund; and (d) performing such additional administrative duties relating to the

administration of the Fund as may subsequently be agreed upon in writing between the Fund and

the Administrator."

   43. In addition to speaking with Ms. Smith and Mr. McCormack, the A Funds

requested from BRC contact information for its third-party service providers, including its

Administrator, as well as a personal reference for Ms. Smith.

   44. Ms. Smith provided contact information for Nottingham's CEO, Kip

Meadows ("Mr. Meadows").

   45. In or around Spring 2016, prior to investing in BRC, A Funds'

representatives spoke with Mr. Meadows about the Fund.

   46. During these discussions, Mr. Meadows told the A Funds that:

  a. He had known Ms. Smith for many years and had a "very high
trust level;"

  b. Nottingham had full access to everything at BRC and logs in
directly to the portal to the brokerage account to "run monthly
numbers;"

  c. Nottingham confirmed total assets under management, calculated
performance and the performance fees, verified and reconciled all
accounts, and produced monthly investor statements; and,

  d. Nottingham verified all returns on a monthly basis and account
statements were only produced after such verification.

   47. Ms. Smith, Bristol Advisors, CV Brokerage, and Mr. McCormack also

gave the A Funds PowerPoint presentations about BRC.

48.     A true and accurate copy of a 2016 PowerPoint presentation about BRC (the "2016 Investor Presentation"), which was provided to the A Funds, is attached hereto as Exhibit 6.

49.     The 2016 Investor Presentation contained many of the same representations that were in the April 4, 2016 Slide Deck.

50.     Ms. Smith, Bristol Advisors, CV Brokerage, and Mr. McCormack also gave the A Funds "tear sheets" about BRC.  These tear sheets were prepared and transmitted to the A Funds by CV Brokerage, Ms. Smith and Mr. McCormack and often bore the Bristol Advisors name and logo.

51.     Upon information and belief, these tear sheets were prepared by Mr. McCormack and Mr. Koppenheffer.

52.     The tear sheets contained the following information about BRC:

a.      Its proprietary strategies for trading in equities and equity options (*e.g.*, Dividend Trades, VIX Option Trades, Volatility Skew Trade);

b.      Its monthly liquidity;

c.      Performance data, historic returns, and assets under management; and,

d.      Its oversight by independent third-party Administrator, Nottingham, and independent third-party Auditor, Sanville.

53.     A true and accurate copy of a July 2016 tear sheet (the "2016 Tear Sheet") is attached hereto as Exhibit 7.

54.     The A Funds relied on these representations contained in the April 4, 2016 Slide Deck, the PPM, the 2016 Investor Presentation, and the 2016 Tear Sheet in making their investments in BRC.

55. The A Funds also relied upon the representations described above from Ms. Smith, Mr. McCormack, CV Brokerage, Nottingham, and Mr. Meadows in making their investments in BRC.

56. In or around September 2016, the A Funds made their first investment in BRC.

57. On or about November 22, 2016, the A Funds arranged for their independent administrator, NAV Fund Administration Group ("NFA"), to wire funds to BRC for two additional investments in the Fund.

58. The Compliance Team at NFA, however, refused to authorize the transfers until it independently verified various representations in the PPM and other offering documents.

59. Specifically, NFA contacted Sanville to verify its role as BRC's Auditor, the dates of its engagement, its review of BRC's trading records, and its examination and verification that TA1 had complied with all composite construction requirements of the Global Investment Performance Standards ("GIPS") for the year ending December 31, 2015 (the "2015 TA1 GIPS Audit").

60. On or about November 23, 2016, NFA spoke with Nick Matteo ("Mr. Matteo"), a senior audit manager with over twenty (20) years' experience in the investment management industry at Sanville.

61. During that call, Mr. Matteo confirmed that Sanville (i) had been engaged to audit BRC's financial statements for the year ending December 31, 2016, (ii) had examined and verified that TA1 had complied with all GIPS requirements for the year ending December 31, 2015, and (iii) that Sanville had not yet reviewed BRC's actual trading records.

62.     In an email from Mr. Matteo to NFA sent later that same day, Mr. Matteo provided a copy of the 2015 TA1 GIPS Audit.  He further explained that Sanville had not yet reviewed BRC's actual trading records because it not yet executed the engagement letter to perform BRC's 2016 audit.

63.     Shortly thereafter, NFA authorized wire transfers from the A Funds to BRC based on Mr. Matteo's representations, including his representation that Sanville would have access to of BRC's actual trades and performance calculations once it had finalized and executed the engagement letter to audit BRC's financial statements.

64.     Between September 2016 and May 2018, the A Funds invested approximately $27 million in BRC.

65.     Shortly after its initial investment, the A Funds were given access to Nottingham's investor portal, which each month purported to calculate the net asset value ("NAV") and investment returns of the Fund based upon the administrator's direct access to BRC's brokerage accounts.  Nottingham each month verified and confirmed to investors, including the A Funds, that BRC was fully invested in publicly traded securities that had liquid market value.  These monthly statements demonstrated that BRC was a growing, successful fund, and gave confidence to the A Funds to stay invested and further invest monies into the Fund.

66.     The above representations, moreover, were repeated in additional investor presentations and tear sheets that were provided to the A Funds during 2017 and 2018.

67.     Additionally, on June 22, 2017, Ms. Smith provided the A Funds with a 2016 Independent Auditor's Report for BRC (the "2016 Independent Auditor's Report") prepared by Sanville.

68.     The 2016 Independent Auditor's Report reaffirmed the A Funds' understanding that BRC was investing in equities and options trading utilizing the dividend capture strategy.  It further reaffirmed the A Funds' understanding that BRC was subject to oversight by independent third-parties.

69.     Indeed, the 2016 Independent Auditor's Report states in relevant part: "we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement. . . . . We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.  In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Broad Reach Capital, LP as of December 31, 2016, and the results of its operation and changes in partners' capital for the year then ended in accordance with accounting principles generally accepted in the United States of America."

70.     The notes to the financial statements included in the 2016 Independent Auditor's Report state that "[t]he majority of the Fund's securities are traded on national and international securities exchanges and are stated at the last reported sales price on the day of valuation."  And that "[i]n the normal course of business, substantially all of the Fund's securities transactions, money balances, and security positions are transacted with the Fund's broker: Industrial and Commercial Bank of China, a major brokerage firm."

71.     A true and accurate copy of Ms. Smith's June 22, 2017 email attaching the 2016 Independent Auditor's Report is attached hereto as Exhibit 8.

72.     The A Funds relied upon the representations described in 2016 Independent Auditor's Report in making subsequent investments in BRC.

73.     In March 2018, BRC advised the A Funds that Sanville was conducting an audit for BRC's 2017 financial statements.

74.     BRC, however, never provided the A Funds with such audited financial statements.

75.     The A Funds also relied upon the representations described above in Paragraphs 26 to 74 from Ms. Smith, Mr. McCormack, Nottingham, Mr. Meadows, and Sanville in making its investments in BRC.

**Surefire Investigates the BRC Investment Opportunity**

76.     Surefire is a special purpose vehicle created specifically to hold investments utilizing the dividend capture strategies.

77.     Beginning in or around August 2018, Surefire conducted wide-ranging due diligence of BRC.

78.     On August 30, 2018, Ariel Shlien ("Mr. Shlien") of Surefire spoke with Ms. Smith to discuss a possible investment in BRC.

79.     During these discussions, Ms. Smith represented to Surefire that:

a.      BRC utilized three trading strategies, all of which involved equities and equity options;

b.      BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors;

c.      BRC was overseen by both a third-party independent Administrator, Nottingham, and third-party independent Auditor, Sanville;

d.      Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC; and,

e.      BRC maintained a ninety (90) day lock up for new investments with liquidity available after thirty (30) days' notice of the first of each month.

80.     The next day, August 31, 2018, George Medina ("Mr. Medina"), BRC's Senior Managing Director of Global Sales, emailed Mr. Shlien a July 2018 tear sheet for BRC, which included the following representations:

a.     "Our fund maintains a high level of liquidity with a rigor and focus on creating consistent positive returns;"

b.     "The current portfolio of strategies include Dividend Capture, VIX Convergence, Volatility Skew, S&P Premium Capture, Opportunistic and Intraday Trading;"

c.     The funds offers "Monthly" liquidity;

d.     The Fund Administrator is Nottingham; and,

e.     The Fund Auditor is Sanville.

81.     A true and accurate copy of Mr. Medina's August 31, 2018 email attaching the July 2018 tear sheet is attached hereto as Exhibit 9.

82.     On September 13, 2018, Surefire had telephone call with Ms. Smith and Mr. Medina to further discuss a possible investment in BRC.  During this call, Ms. Smith and Mr. Medina represented that:

a.     Ms. Smith's personal investments represented approximately fifteen percent (15%) of BRC's assets;

b.     BRC trades about $150 million to $200 million each day;

c.     BRC's independent fund Administrator is Nottingham; and,

d.     BRC's tear sheets show its net returns.

83.     Mr. Medina and Ms. Smith later sent additional tear sheets to Surefire as part of its pre-investment due diligence (the "2018 BRC Tear Sheets").

84.     True and accurate copies of the 2018 BRC Tear Sheets are attached hereto as Exhibit 10.

16

85.     On October 9, 2018, Mr. Shlien and Jason Green ("Mr. Green"), a Surefire analyst, met with Ms. Smith, Mr. Medina, and two BRC traders, Mr. Koppenheffer and Jason Ferrari ("Mr. Ferrari"), at BRC's New York Office located at 1633 Broadway, 28th Floor, New York, NY 10019 to further discuss Surefire's possible investment in BRC.

86.     During the meeting, the BRC team represented that:

a.      BRC employed three core trading strategies: (1) dividend capture; (2) intra day/opportunistic; and (3) VIX Calls;

b.      Every trade has a tight stop loss;

c.      Every trade is hedged; and,

d.      Ninety percent (90%) of the trades are exited the same day.

87.     On October 11, 2018, Mr. Medina emailed Surefire BRC's 2018 investor PowerPoint presentation (the "2018 Investor Presentation"), which contained the following representations:

a.      "Since inception, 57.07% annualized return to investors, net of all fees and expenses;"

b.      "Alignment of Interests – [Ms.] Smith, 100% owner of the General Partner and Investment Manager of the Fund [BRC], with her Advisory Board and key employees constitute over 15% of the Fund;"

c.      BRC's Portfolio Construction consists of three strategies, "Dividend Capture," "Short-Term Opportunistic Trading," and "VIX Convergence;"

d.      BRC's "Reporting" is monitored by "Independent third party administrator: Nottingham Investment Vehicle Solutions" and "Independent third party audit firm: Sanville & Co;" and,

e.      BRC's "Offering Terms" include "Liquidity – Monthly with 30 days' notice with no lock-up."

88. A true and accurate copy of Mr. Medina's email and the 2018 Investor Presentation is attached hereto as Exhibit 11.

89. On October 22, 2018, Mr. Green spoke with Mr. Medina, Mr. Koppenheffer, and Mr. Ferrari to review the Dividend Capture Trading Strategy. During that discussion, the BRC team represented that:

    a. Dividend Capture trading comprises ~ 1/3 of the underlying fund's profits on average;

    b. The traders average ten to twenty (10-20) trades per day for this strategy; and,

    c. Ninety percent (90%) of the trades are closed within one day.

**Surefire is Provided 2016 Independent Auditor Report for BRC**

90. On November 6, 2018, Ms. Smith sent to Surefire a copy of the 2016 Independent Auditor's Report, which was prepared by Sanville.

**Nottingham Confirms Its Role as the Fund's Gatekeeper**

91. On November 21, 2018, Mr. Green at Surefire spoke to Mr. Meadows at Nottingham as part of Surefire's due diligence before investing in BRC. During that call, Mr. Meadows told Mr. Green that:

    a. Nottingham had known and worked with Ms. Smith for six to seven (6-7) years;

    b. Nottingham calculated the monthly NAV of the fund;

    c. Nottingham verified monthly performance through online portal to the brokerage account;

    d. Nottingham generated and sent monthly statements to investors;

    e. Nottingham reviewed the fund balance monthly, reconciled statements and calculated performance fees; and,

    f. Nottingham had online access to all the brokerage accounts.

92.     On December 13, 2018, Mr. Medina emailed Surefire a copy of BRC's PPM.

93.     The PPM represents that Nottingham served as the Fund's independent third-party Administrator and provided certain administrative, accounting and investor services to the Fund.

94.     Specifically, the PPM states that "[p]ursuant to the terms of an Administration Agreement between the Fund and the Administrator, the Administrator [was] responsible, under the ultimate supervision of the General Partner, for providing all administrative services required in connection with the Fund's operations, including: (a) managing the purchase and redemption process; (b) computing the Net Asset Value of the Fund; (c) maintaining the register of investors and entering on such all issues, transfers, and redemption of Interests in the Fund; and (d) performing such additional administrative duties relating to the administration of the Fund as may subsequently be agreed upon in writing between the Fund and the Administrator."

95.     A true and accurate copy of Mr. Medina's December 13, 2018 email is attached hereto as Exhibit 12.

**Ms. Smith Confirms Her Alleged Investment Into the Fund**

96.     In December 2018, Surefire asked Ms. Smith for a copy of her BRC account statement so that it could verify her representation that she was personally invested in BRC and, thus, her interests were aligned with those of the fund.

97.     Shortly thereafter, Ms. Smith provided Surefire with the November 2018 BRC account statement (the "Nov. 2018 Smith BRC Account Statement").

98.     A true and accurate copy of the Nov. 2018 Smith BRC Account Statement is attached as Exhibit 13.

**Mr. Iregui Poses as a BRC Investor and Vouches for Ms. Smith**

99.     As part of its due diligence, Surefire asked to speak with current BRC investors about their experiences with BRC and Ms. Smith.

100.    In response, Ms. Smith provided contact information for several persons, including Mr. Iregui.

101.    On October 2, 2018, representatives from Surefire spoke with Mr. Iregui on the telephone.  During the call, Mr. Iregui told Surefire, among other things, that: (a) he was a professional investor; (b) he had been invested in BRC for approximately two years; and (b) no one but Ms. Smith could replicate the dividend capture trade because it requires special infrastructure and being "grandfathered in."

102.    Upon information and belief, each of these statements was false and intended to bolster Ms. Smith's credibility and solicit Surefire's investment.  As described further below, it now appears that Mr. Iregui was in cahoots with Ms. Smith and was himself siphoning money from the Fund.

**Surefire's Investment in BRC**

103.    Between January and March 2019, Surefire invested approximately $4.5 million in BRC.

104.    Surefire relied on the representations contained in the PPM, the 2016 Independent Auditor's Report, the 2018 Investor Presentation, and the 2018 Tear Sheets in making its investments in BRC.

105.    Surefire also relied upon the representations described above in Paragraphs 76 to 104 from Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Nottingham, Mr. Meadows and Sanville in making its investments in BRC.

**The A Funds Transfers Their BRC Investments to Surefire**

106.    On or about February 27, 2019, the A Funds transferred their investments in BRC to Surefire (the "Transfer") and, thereafter, became an investor in Surefire. The Transfer was approved in writing by BRC.

107.    Following the Transfer, Surefire's total investment in BRC was approximately $46.6 million.

108.    The Transfer was recorded on BRC's books and records as a redemption by the A Funds and a simultaneous investment of $41,580,190.90 by Surefire.

**Surefire Redeems its Limited Partnership Interests in BRC**

109.    In a March 18, 2019 letter from BRC's counsel, Blank Rome LLP ("Blank Rome"), to Surefire, BRC threatened to involuntarily redeem Surefire's investment. In the letter, BRC accused Surefire of "improperly solicit[ing]" other BRC limited partners to transfer their interests to Surefire.

110.    In light of BRC's odd behavior, baseless accusations and threats, Surefire decided to fully redeem its investments in BRC as of March 31, 2019.

111.    Pursuant to § 7.1 of the LPA, Surefire submitted its Request for Redemption. Specifically, the request was attached to a response letter from Surefire's attorney, Ulmer and Berne, LLP ("Ulmer"), to Blank Rome.

112.    A true and accurate copy of Ulmer's March 22, 2019 letter submitting Surefire's Request for Redemption is attached hereto as Exhibit 14.

**BRC Accepts the Redemption and Promises to Return the Investment by May 15, 2019**

113.   Three days later, BRC accepted Surefire's redemption.

114.   In a March 25, 2019 letter from Blank Rome, BRC advised Surefire that the "Redemption request will be processed pursuant to the standard terms of Section 7.1 of the LPA."

115.   A true and accurate copy of Blank Rome's March 25, 2019 letter is attached hereto as Exhibit 15.

116.   In follow up emails, BRC confirmed: "The effective redemption date would be April 30, 2019. The wire would go out on May 15, 2019."

117.   A true and accurate copy of the March 27-28, 2019 email chain between Blank Rome and Ulmer is attached hereto as Exhibit 16.

118.   Pursuant to the redemption request, on April 30, 2019, BRC closed Surefire's capital account. Indeed, Surefire's BRC account statement shows that $46,598,676.84 was withdrawn in April 2019, and that the account had a $0 balance as of April 30, 2019.

119.   A true and accurate copy of Surefire's BRC account statement for April 2019 is attached hereto as Exhibit 17.

120.   Similarly, records from Nottingham showed that Surefire's capital account balance was $0 as of April 2019.

121.   A true and accurate copy of a print-out from Nottingham's web portal page is attached hereto as Exhibit 18.

122.   On May 3, 2019, Surefire emailed Ms. Smith asking for an update on the May 15, 2019 wire transfer.

123.    On May 6, 2019, Ms. Smith responded that she would provide confirmation closer to May 15, but "So far, we are on track."

124.    A true and accurate copy of the May 3-6, 2019 email exchange between Surefire and Ms. Smith is attached hereto as Exhibit 19.

125.    In short, BRC agreed to redeem Surefire's investment and wire $46,598,676.84 to Surefire on or before May 15, 2019 (the "Redemption Agreement").

**BRC Fails to Pay the Redemption and Lulls Surefire with Fraudulent Account Statements**

126.    BRC failed to wire the funds to Surefire on May 15, 2019 as promised.

127.    On May 17, 2019, Surefire emailed Ms. Smith, asking about the status of the wire transfer.

128.    Ms. Smith responded, stating: "I will know more exact wire date on Tuesday morning.  Thank you for your patience."

129.    On May 22, 2019, Surefire followed up with another email to Ms. Smith about the status of the wire.

130.    Ms. Smith responded: "I am waiting on one banker acknowledgment by close of business today."

131.    The next day, on May 23, 2019, Surefire again emailed Ms. Smith looking for a status on the wire.

132.    On May 30, 2019, Surefire emailed Ms. Smith, stating:

Brenda,

Both Christel and I have been trying to reach you without success. The wire is now 2 weeks late and each small delay you advise us of, passes without any notification or update from you.  Our investors are now calling us daily and the pressure for us is rising. This situation is simply not acceptable.  You are forcing us to

escalate this and I truly wish you would not put us in this position. Our relationship does not need to end like this.

PLEASE ISSUE THE REDEMPTION WIRE TODAY AND SEND US CONFIRMATION.  If you are unable to do so, I need to understand why and have a person who can speak with to confirm the funds are available and delayed for whatever reason.

I am not sure how much more clear I can be.

Ariel

133.    Ms. Smith responded stating: "I will provide proof of funds or wire confirmation by the end of this week."

134.    The following morning, on May 31, 2019, Surefire emailed Ms. Smith, stating:

Brenda,

Today's the day!!  We need the wire confirmation by 3 pm EST so the bank can make any wire cutoff time they may have.  Please be advised I have shared with my investors your commitment to get the wire out today and have been given until the end of day today to get a confirmation to everyone.  Failing which, I have been told that at least 2 will proceed to file complaints with SEC and FINRA against Broad Reach and perhaps Nottingham as well.

Please understand I am not threatening.  I am just relaying the message I have received from my investors stemming from their deep frustration.  You have had months to prepare for a May 15 wire date that you and your attorney have confirmed.  The wire is now 2 weeks late and you have missed each of the 3 delay deadlines you have offered.  I cannot contain this anymore.  End of day today or this is out of my control . . .
Please get wire out today and email us written wire confirmation.

Ariel

135.    At 10:22 a.m. Ms. Smith responded: "Received and understood."

136.    A true and accurate copy of the May 17-31, 2019 email exchange is attached hereto as Exhibit 20.

24

137.     Later that same afternoon, Ms. Smith offered an excuse for why Surefire had not been paid.  Specifically, Ms. Smith claimed that BRC had invested in "long dated" option contracts and that liquidating those options to fund the redemption would "require her to take a haircut."  To avoid that purported "haircut," Ms. Smith stated that she or CV International - - a foreign investment fund managed by her - - would purchase Surefire's position in BRC.

138.     Ms. Smith told Surefire that she would provide "proof of funds" showing that Surefire's investment in BRC was intact.

139.     In a May 31, 2019 letter to Surefire, BRC wrote:

Dear Limited Partner:

This serves as notice that I am in receipt of your redemption request.  There has been a slight delay in receiving funds based on the attached resolution.  As such, **I wanted to provide this *proof of funds* so that your underlying investors know that their capital is intact.**

I do anticipate being able to transmit the funds during the month of June and will continue to work on increasing liquidity of this asset. I will keep you informed accordingly.

Sincerely,

Brenda A. Smith

(emphasis added).

140.     Ms. Smith's letter attached - - as purported proof of funds - - a document entitled "CV International Investments Limited - Action By Written Consent of the Directors." The document further states: "**RESOLVED**, the Company is the owner of medium term notes issued by HSBC Holdings PLC with the ISIN No. US404280AH22 and has transferred $100 Million of such notes to Broad Reach Capital LP effective as of December 31, 2017 and such transfer is hereby ratified, approved, adopted and confirmed . . . ." (emphasis added).

25

141.    The consent of directors was signed by both Ms. Smith and Mr. Iregui, as directors of CV International.

142.    A true and accurate copy of BRC's May 31, 2019 letter (which was emailed to Surefire at 4:10 p.m.) is attached hereto as Exhibit 21.

143.    As further "proof of funds," Ms. Smith emailed Surefire later that same evening an HSBC "bank statement" purporting to show CV International's ownership of a $2.5 billion bond (the "HSBC Bond").

144.    On June 14, 2019, Ms. Smith emailed Surefire stating that she was traveling to London the following week to monetize the HSBC bond.  She further asked Surefire not to tell anyone that she owned the HSBC Bond:

> Ariel –
>
> Please use this email address for me as this is offshore business.  I am going to London early next week to monetize the financial instrument.  The ISIN was in your letter and is US404280AH22. **For my safety, I would appreciate you keeping this information confidential (that I am the owner).**  If you can wait until next week, I should be able to have liquidity once in London bank.  I currently have the instrument at HSBC Hong Kong and the time zone difference is causing issues with certain transactions.  I do not expect to hear anything more from my HK banker until early next week as it is 11:30 p.m. on Friday night.  Hope this helps **and please do not forward this to anyone.** Brenda

(emphasis added).

145.    A few hours later, Surefire responded to Ms. Smith's email, asking: "Why does Bloomberg show a completely different list of owners for this specific bond?  See attached Bloomberg analysis."

146.    Confronted with this email, Ms. Smith changed her story - - and claimed that she in fact represented very wealthy families who in turn owned the HSBC Bond, and that

she was brokering the sale of a $500 million portion of the HSBC bond to Metlife.  She further

claimed that the sale would close in June, and that she would use her commission on the sale to

purchase Surefire's $46.6 million interests in BRC.

147.    Over the next several days, Surefire pressed Ms. Smith for additional

information.  Ms. Smith responded with cryptic messages and repeated assurances that Surefire

would have its money soon.

148.    Defendants' representations concerning the "proof of funds" were false

when made and was intended to lull Surefire into a false sense of security so that it would delay

taking legal actions and expose the fraudulent scheme.

149.    Likewise, Defendants' claims regarding the imminent sale of some or all

of the HSBC Bond were false when made to induce Surefire to delay further action that would

expose the fraudulent scheme.

**BRC Refuses to Allow Surefire to Examine its Books and Records**

150.    Section 9.1 of the Limited Partnership Agreement ("LPA") provides

Surefire with the right to inspect and copy BRC's books and records within two business days of

any request.  Specifically, § 9.1 provides:

> The General Partner shall cause the Partnership to maintain true
> and accurate books, records, reports, and accounts in which shall
> be entered all transactions of the Partnership.  The General Partner
> shall also maintain all schedules and exhibits to this Agreement
> and shall update such schedules and exhibits promptly upon receipt
> of new information relating thereto.  **Copies of such books,
> records, reports, accounts and schedules shall be located at the
> principal office of the General Partner and *shall be available to
> any Partner for inspection and copying* upon at least two
> Business Days notice, during reasonable business hours . . . .**
>
> (emphasis added).

151.    On June 17, 2019, Surefire emailed Ms. Smith requesting detailed account statements that identified BRC's holdings.

152.    On June 18, 2019, Surefire again emailed Ms. Smith asking for an update on payment and stating "I need a copy of Broad Reach's books and records along with Broad Reach account statements.  This request will not go away … can you advise me who on your team or at Nottingham can assist me?"

153.    Ms. Smith ignored Surefire's request to inspect BRC's books and records. Instead, she repeatedly assured Surefire that it would receive its money soon.

154.    On June 25, 2019, counsel for Surefire sent a letter to BRC and Blank Rome demanding to inspect BRC books and records, pursuant to § 9.1 of the LPA.

155.    On June 27, 2019, Blank Rome acknowledged receipt of the request but stated that BRC needed "additional time to gather the materials" and review them for privilege.

156.    A true and accurate copy of Blank Rome's June 27, 2019 letter is attached hereto as Exhibit 22.

**The JAMS Arbitration to Enforce the Redemption**

157.    On July 1, 2019, Surefire filed a demand for arbitration to recover the proceeds from its redemption.[1]

158.    At the same time, Surefire filed an Emergency Motion for Preliminary Injunction.

159.    On July 3, 2019, the Arbitrator entered a Stipulated Temporary Order: (1) requiring BRC to immediately produce a listing of its assets with current valuations; (2)

---

[1] Pursuant to § 10.4 of the LPA, the arbitration was filed with JAMS in Pennsylvania.

compelling BRC to produce its books and records; and (3) freezing BRC's assets up to the amount of the unpaid redemption (*e.g.*, $46,598,676.84).

**BRC and Ms. Smith Flout the Arbitrator's Orders**

160.    On July 3, 2019, BRC supplied a one-page "listing of assets," which claimed that BRC held $129,560,000 in HSBC bonds, a "Securitized cryptocurrency" valued at $20,250,000, and $12 million in unidentified "Notes." The listing of assets further stated that BRC had approximately $2.6 million in its prime brokerage account and $750,000 in its bank accounts.

161.    When pressed to provide evidence that BRC actually owned these assets (*i.e.*, purchase documents and holder information), Defendants went radio silent and it is apparent that the asset list is completely fictitious.

162.    These alleged assets, moreover, are ***not*** consistent with the investment strategies described by BRC to investors in the PPM, Investor Presentations, attribution analysis, and tear sheets. They also are not consistent with Defendants' numerous representations to the A Funds and Surefire prior to their investing in BRC.

163.    A true and accurate copy of the July 3, 2019 listing of assets is attached hereto as Exhibit 23.

164.    Instead of producing its books and records, as required by the Stipulated Temporary Order, BRC produced sixty-two (62) pages of incomplete, misleading, and falsified documents.

165.    Because BRC failed to comply with the Stipulated Temporary Order, Surefire asked the Arbitrator to issue third-party document subpoenas to BRC's banks, administrator, auditors, and custodian.

166.     Despite stipulating to the subpoenas, upon information and belief, Ms. Smith contacted certain of the third-parties and interfered with their document production - - in some instances, directing them not to comply with the subpoenas.

**Documents Obtained by Surefire Expose the Securities Fraud**

167.     Documents that Surefire has obtained through the Arbitration demonstrate that Defendants' representations to induce the A Funds and Surefire to invest in BRC were false when made.

168.     Contrary to Defendants' representations, BRC was *not* invested 100% in equities and equity options.  Instead, the account statement produced by BRC's custodian, Industrial and Commercial Bank of China ("ICBC"), and BRC's Listing of Assets show that only a tiny fraction of the Funds' assets were actually used to trade equities and equity options.

169.     Contrary to Defendants' representations, moreover, Nottingham did not act as an independent third-party administrator for the Fund.  Nottingham was supposed to: (a) manage the purchase and redemption process; (b) compute the Net Asset Value of the Fund; and, (c) maintain the register of investors and enter on such all issues, transfers, and redemption of Interests in the Fund.

170.     Instead, Nottingham's emails show that it acted at the direction of Ms. Smith - - creating phony account statements from the information that Ms. Smith provided.

171.     In a February 22, 2017 internal Nottingham email, the CEO of Nottingham, Kip Meadows, wrote, in relevant part: "I just talked to her [Brenda Smith], she said she will send those % tonight. *We can take her fund valuation data and create shareholder accounts. With a partnership the liability for the data is on the GP, not us. She recognizes that and is completely comfortable with the numbers she has provided.*" (emphasis added).

172.    In a June 6, 2018 internal email, Nottingham internally discussed its

potential liability for its involvement in BRC.  Specifically, Nottingham's EVP of Client

Development, Kate Honey wrote to its Mr. Meadows:

> *I have concern that 1) contract state's we're valuing, 2) we have*
> *documentation I think saying we need this info in order to be able to*
> *value, but never received it,* it might still be hard to prove.  Based on the
> latest communication, she's [Brenda Smith] had back/forth with him
> [another BRC investor] on calculations and could be throwing Nottingham
> under the bus.  We do not know b/c we are cut out!  I fear she could use
> Nottingham as scapegoat!

(emphasis added).

173.    Mr. Meadows replied:

> Understand.  I can find that out with a call to him.  I'll also reach back out
> to her.

> *The good thing is that a non registered fund isn't under purview of*
> *either SEC or FINRA and our role certainly isn't* but just like with any
> lawsuit, it doesn't necessarily matter whether it will succeed, it's the
> hassle expense factor during.

(emphasis added).

174.    A true and accurate copy of Nottingham's internal June 6, 2018 email

chain is attached as <u>Exhibit 24</u>.

175.    In August 2018, Nottingham again discussed its potential liability for its

involvement in BRC.  Specifically, an investor (Spouting Rock Asset Management) questioned

Nottingham about certain fees that Ms. Smith had charged BRC.  In responding to the inquiry,

Nottingham admitted:

> We do not receive a detail breakdown of the changes in the fund.  What
> we see from Brenda's report is the total earnings.  Brenda would be the
> person to provide the details as to the fee schedule.

176.    In his reply email, the investor wrote: "Are you not the administrator of the fund?  As such, is it not your responsibility to be doing the accounting and administration on the fund?"

177.    Nottingham discussed the situation internally, writing:

*I was worried about this.*  I raised the question when this started if Spouting Rock was aware of our limited role and responsibilities for the Broadreach relationship. *This is a sensitive account/relationship . . . .*

(emphasis added).

178.    Mr. Meadows then wrote to Ms. Smith:

You know I love you, but if we don't get this all straight and figured out within the next few weeks we're resigning.  I can't be put in a position where we are not doing our job because we don't have information and *we both look really bad and have tons of liability.*

(emphasis added).

179.    A true and accurate copy of the August 15, 2018 email chain concerning Spouting Rock is attached as Exhibit 25.

180.    Contrary to Ms. Smith's representations to Surefire, she was not personally invested in BRC.

181.    Indeed, the Nov. 2018 Smith BRC Account Statement was fabricated by Nottingham at Ms. Smith's request and direction.

182.    In a December 7, 2018 email to Nottingham, Ms. Smith wrote:

Surefire wants to see a statement for me.  Could you possibly prepare one for me?  I came into 2018 with 3,138,568 and have earned 12,345,000 incentive allocation thru Nov. 30 with draws of 2,000,000.

This is supposed to be the last item they need and I would really appreciate it.  Could you please email to me as I am on a river cruise for my sister's birthday.

183.    Nottingham responded:

Hey Brenda,

We will need the data broken down per month in order to generate a statement.  Once we have received the information, we can generate the statement.  Let me know if you have any questions.

184.    Ms. Smith replied: "Just divide evenly please as we only email him

November."

185.    When pressed for more information by Nottingham, Ms. Smith wrote:

Can we please divide evenly?  I am out of the country & can give all specifics as soon as back.  **This is only for one prospect & will not go anywhere else.**

(emphasis added).

186.    Mr. Meadows then replied: "We'll come up with a ballpark based on other

shareholders.  We'll take care of it from here."

187.    A true and accurate copy of the December 7-11, 2018 email chain is

attached as Exhibit 26.

188.    Nottingham then created the phony account statement and gave it to Ms.

Smith so that she could provide it to Surefire and land its investment.

**The PNC Bank Statements Show that BRC Transferred Plaintiff's Investment to Earlier Investors and Other Entities Controlled By Ms. Smith**

189.    Bank account statements for BRC show that virtually none of Plaintiff's

funds actually went to purchasing any legitimate fund assets.

190.    Instead, the account statements show that Ms. Smith quickly transferred

Plaintiff's investments out of BRC to either earlier investors, one of her other entities (including

but not limited to Investment Cons), or places not yet known.

33

191.    Upon information and belief, Ms. Smith transferred millions of dollars of

BRC's assets to Mr. Iregui either directly or through on of his entities, including but not limited

to TN Investment Cons.

**FINRA Investigates Ms. Smith and Bars Her from the Securities Industry**

192.    FINRA recently investigated Ms. Smith in connection with CV Brokerage.

193.    FINRA documents dated May 23, 2019 describe the investigation as

follows:

> Non-compliance with FINRA Rules 8210 and 2010 in that Ms.
> Smith failed to provide documents and information requested in
> connection with a FINRA investigation into potential
> misstatements about the financial performance of an investment
> fund that were made during the course of private securities
> transactions in which Ms. Smith participated.

194.    A true and accurate copy of Ms. Smith's FINRA Broker Check is attached

as Exhibit 27.

195.    Ms. Smith's Broker Check further states that she resigned from CV

Brokerage, Inc. on June 14, 2019 after allegations were made against her.

196.    On July 2, 2019, FINRA barred Ms. Smith from the securities industry.

**Ms. Smith Is Arrested and Charged with Securities Fraud.**

197.    On August 27, 2019, Ms. Smith was arrested by the Federal Bureau of

Investigation and charged with four counts of wire fraud and one count of securities fraud.

198.    According to the August 27, 2019 press release issued by United States

Attorney for the District of New Jersey (who is handling the criminal prosecution):

> Smith orchestrated a scheme using her investment fund,
> Broad Reach Capital, in which she lied to investors about
> the assets and performance of the fund and falsely stated
> that she would invest their funds in particular trading
> strategies.   Smith collected more than $100 million in

investments.   Instead of investing the money as she
promised, she diverted millions of dollars of investor funds
out of Broad Reach Capital for other purposes, including
paying other investors.

199.   Ms. Smith is currently being detained pending her criminal trial.

**The Securities and Exchange Commission Sue Ms. Smith and Her Entities for Securities
Fraud and Freeze Her Assets and the Bank Accounts of Her Various Entities.**

200.   On August 27, 2019, the Securities Exchange Commission ("SEC") filed a

civil complaint for securities fraud against Ms. Smith, BRC, Broad Reach Partners, LLC, and

Bristol Advisors.

201.   A true and accurate copy of the SEC Complaint is attached hereto as

Exhibit 28.

202.   The SEC Complaint alleges that:

a.      "To solicit and retain investors, Defendants represented that the Fund
employed several profitable, sophisticated trading strategies involving
highly liquid securities, including those that it was uniquely positioned to
pursue because of its access to the Philadelphia Stock Exchange trading
floor ('Trading Strategies').  In reality, only a small fraction of investor
money was actually used for these strategies."  (SEC Complaint ¶4).

b.      "The vast majority of the funds were moved through the bank accounts of
entities Smith controls and ultimately used to, among other things, make
her own personal investments and to repay other investors.  To lull
existing investors and solicit additional investments, Defendants provided
monthly account statements reflecting high returns and 'tear sheets'
touting the Fund's overall claimed 30%+ yearly return and that the Fund
had never had a losing month.  These and other performance statements
were false."  (SEC Complaint ¶5).

c.      "since the Fund's inception, Smith used over $2 million of the Fund's
assets (filtered through three of her entities) to pay American Express
bills.  None of this capital was engaged in the claimed profitable Trading
Strategies."  (SEC Complaint ¶25).

d.      "although investors contributed approximately $105 million to the Fund,
the high point of all brokerage and bank accounts in the name of the Fund

and its purported affiliates was no more than $31.8 million in December 2016." (SEC Complaint ¶26).

**The Defendants Acted with Scienter**

203.    Defendants knew that the statements that they made to the A Funds and Surefire to induce their investments in BRC were false.

204.    Defendants knew, among other things, that:

a.    BRC was not investing the monies received from A Funds and Surefire in the enunciated trade strategies - - *e.g.*, "Dividend Capture," "Short-Term Opportunistic Trading," and "VIX Convergence;"

b.    BRC was not investing in highly liquid equities and equity options;

c.    the historical financial performance data provided to the A Funds and Surefire was false;

d.    BRC's 2016 audited financial statement, the tear sheets, and the PowerPoint presentations all were false;

e.    Ms. Smith was not personally invested in BRC and her interests were not aligned with the interests of the Fund;

f.    BRC had no independent third-party oversight from either Nottingham or Sanville; and,

g.    Funds were being siphoned out of BRC.

**No Safe Harbor**

205.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified specifically as "forward-looking statements" when made, and at most included a general, non-specific disclaimer in other portions of the same document. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false purportedly forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by BRC's executives, Ms. Smith and/or Mr. McCormack, who knew that those statements were false when made.

## CAUSES OF ACTION

### COUNT I
**(Violations of Section 10 (b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder Against Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer)**

206.   Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

207.   As detailed above, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer falsely represented to the A Funds and Surefire in connection with its purchase of limited partnership securities in BRC that, among other things: (i) BRC utilized three trading strategies, all of which involved equities and equity options; (ii) BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors; (iii) by using this strategy, BRC historically had consistent profitable returns since inception; (iv) BRC was overseen by both a third-party independent Administrator, Nottingham, and third-party independent Auditor, Sanville; and (v) Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC.

208.   These statements were materially false and misleading when issued because, among other things: (i) BRC was not investing in the equity and option strategies that it

represented to Plaintiff; (ii) BRC was not following any of the claimed procedures, including use of an independent third-party Administrator, to assure the Fund's investments were supported by real assets and transactions; (iii) liquidity was not available after thirty (30) days' notice of the first of each month; and (iv) Ms. Smith and her team were not investors in BRC and had no "alignment of interests."

209.     At all pertinent times, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer acted with the requisite scienter when issuing these false and misleading statements because: (i) they knew that they never intended to follow the investment objectives, strategies and methods that they claimed to be following; (ii) they knew that they were not following the investment objectives, strategies and methods that they claimed to be following; (iii) they knew or should have known that the bulk of BRC's assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; and, (iv) they knew that they had not taken any procedures, including use of an independent third-party Administrator to assure that the BRC's investments were supported by real assets and transactions.

210.     Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer knew or recklessly disregarded that their materially false and misleading statements were the principal means by which Surefire was induced to invest, make additional investments, and maintain its investments in BRC.

211.     Surefire would not have purchased the securities of BRC if it had known that the statements were materially false and misleading and/or omitted to state material facts necessary in order to make the statements made - - in light of the circumstances under which they were made - - not misleading, as detailed above.

212.    By virtue of the foregoing, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer individually and in concert with one another, violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they, directly and indirectly, by use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct whereby they knowingly and/or recklessly made material misrepresentations and failed to correct misrepresentations which were materially false and misleading in light of the circumstances in which they were made, employed devices, schemes and artifices to defraud, and engaged in acts and practices and a course of business that operated as a fraud and deceit upon Surefire in connection with its purchases of limited partnership interests in BRC.

213.    The misrepresentations were made in connection with the purchase and sale to investors, including Surefire, of limited partnership securities in BRC, and to induce it to purchase such limited partnership interests.

214.    As a direct and proximate result, Surefire has suffered damages in an amount to be proven at trial.

**COUNT II**
**(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder Against Nottingham)**

215.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein

216.    As detailed above, and as specifically set forth in Paragraphs 169 through 179, Nottingham knowingly and/or recklessly, in disregard of red flags that should have alerted it to Ms. Smith's fraud and explicit warnings that such fraud was occurring, made materially false and misleading statements and issued false reports to Surefire.

39

217.    Specifically, and as set forth in Paragraphs 43 through 45 and 91, Mr. Meadows told the A Funds and Surefire that Nottingham, as BRC's independent third-party Administrator: (i) had full access to everything at BRC and logs in directly to the portal to the brokerage account to "run monthly numbers;" (ii) confirmed total assets under management, calculated performance and the performance fees, verified and reconciled all accounts, and produced investor statements; (iii) verified all returns on a monthly basis and account statements are only produced after such verification; (iv) calculated the monthly NAV of the Fund; (v) verified monthly performance through online portal to the brokerage account; (vi) generated monthly statements and sends to investors; and, (vii) reviewed the Fund balance monthly, reconcile statements and calculates performance fees.

218.    These statements were materially false and misleading when issued because Nottingham: (i) did not have access to *any* underlying information at BRC; (ii) did not confirm BRC's total AUM or verify and reconcile any investor accounts; (iii) did not verify any returns on a monthly basis before producing monthly statements; (iv) did not calculate the monthly NAV of the Fund; (v) did not verify monthly performance; and (vi) issued phony account statements based on the numbers Ms. Smith provided.

219.    Nottingham knew or recklessly disregarded that its statements to the A Funds and Surefire, as well as the monthly investor statements issued by it, were the principal means by which the A Funds and Surefire were induced to invest and make additional investments in BRC, in that there was no other purportedly independently-verified information available to investors and limited partners upon which they could rely.  Nottingham was under an affirmative duty to obtain competent evidential material verifying the assets held by BRC, yet it failed to do so.

220.    Surefire would not have purchased the securities of BRC if it had known that the statements Nottingham made were materially false and misleading and/or omitted to state material facts necessary in order to make the statements made - - in light of the circumstances under which they were made - - not misleading, as detailed above.

221.    By virtue of the foregoing, Nottingham individually and in concert with Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Mr. McCormack, violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it, directly and indirectly, by use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct whereby it knowingly and/or recklessly made material misrepresentations and failed to correct misrepresentations which were materially false and misleading in light of the circumstances in which they were made, employed devices, schemes and artifices to defraud, and engaged in acts and practices and a course of business that operated as a fraud and deceit upon Surefire in connection with its purchases of limited partnership interests in BRC.

222.    The misrepresentations were made in connection with the purchase and sale to investors, including Surefire, of limited partnership interests in BRC, and to induce it to purchase such limited partnership interests.

223.    As a direct and proximate result, Surefire has suffered damages in an amount to be proven at trial.

## COUNT III
**(Violations of Section 20(a) of the Exchange Act Against Ms. Smith and Mr. McCormack)**

224.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

225.     Ms. Smith and Mr. McCormack are control persons of BRC, Bristol Advisors, CV Investments, CV International, and CV Brokerage within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

226.     At all times relevant herein, and as specifically alleged in Paragraphs 2 through 11, Ms. Smith and Mr. McCormack acted as control persons of BRC, Bristol Advisors, CV Investments, CV International, and CV Brokerage within the meaning of Section 20(a) of the Exchange Act.  Specifically, by virtue of their high-level positions, participation in and/or awareness of BRC's, Bristol Advisors', CV Investments', CV International's, and CV Brokerage's operations, direct involvement in the day-to-day operations, intimate knowledge of the actual performance, and their power to control public statements about BRC, Ms. Smith and Mr. McCormack had the power and ability to control the actions of BRC, Bristol Advisors, CV Investments, CV International, CV Brokerage and its agents and employees, and did in fact exercise such control and participation in the primary violation of Section 10(b) and Rule 10b-5 alleged herein.

227.     Ms. Smith and Mr. McCormack are liable for the wrongful conduct alleged herein and are liable to Surefire for damages suffered thereby in amounts to be determined at trial.

**COUNT IV**
**(Violations of 70 P.S. §§ 1-401 and 1-501 of the Pennsylvania Securities Act Against Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer)**

228.     Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

229.     At all times relevant herein, and as specifically alleged in Paragraphs 24 through 191, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage,

Mr. McCormack, and Mr. Koppenheffer made, approved, and disseminated untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading, in connection with the sale and purchase of limited partnership interests in BRC to Surefire in Pennsylvania.

230.   Specifically, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer falsely represented to Surefire in connection with its purchase of limited partnership interests in BRC that: (i) BRC utilized three trading strategies, all of which involved equities and equity options; (ii) BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors; (iii) by using this strategy, BRC historically had consistent profitable returns since inception; (iv) BRC was overseen by both a third-party independent Administrator, Nottingham, and third-party independent Auditor, Sanville; and (v) Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC.

231.   These statements were materially false and misleading when issued because Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer: (i) knew that they never intended to follow the investment objectives, strategies and methods that they claimed to be following; (ii) knew that they were not following the investment objectives, strategies and methods that they claimed to be following; (iii) knew or should have known that the bulk of BRC's assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; (iv) knew that they had not taken any procedures, including use of an independent third-party Administrator to assure that the BRC's investments were supported by real assets and transactions; (v) knew that the Fund did not offer monthly liquidity to investors; and (vi) knew

that Ms. Smith and her team were not investors in BRC and, therefore, had no alignment of interests.

232.     In purchasing and holding BRC securities in Pennsylvania, Surefire relied directly on the false and misleading statements and omissions made by Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer.  Surefire acquired BRC shares without knowledge that Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormick, Mr. Koppenheffer had misstated or omitted material facts.

233.     Surefire would not have purchased BRC shares in the quantities it purchased, at the prices they paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack, and Mr. Koppenheffer's misleading statements.

234.     As a direct and proximate result of Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack, and Mr. Koppenheffer's conduct, Surefire has suffered damages in an amount to be proven at trial, plus pre-judgment and post-judgment interest, punitive damages, costs and such other relief as the Court determines to be necessary.

## COUNT V
**(Violations of 70 P.S. §§ 1-501 and 1-503 of the Pennsylvania Securities Act Against Nottingham)**

235.     Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

236.    Nottingham, individually and in concert with Ms. Smith, indirectly participated in a course of conduct employing devices, schemes and artifices to defraud in connection with the sale of limited partnership interests in BRC to Surefire.  Specifically, Nottingham, acting individually and in concert with others, materially aided in acts or transactions constituted by making material misrepresentations and/or omissions as specifically set forth in Paragraphs 169  through 188.

237.    As a direct and proximate result of Nottingham's conduct, Surefire has suffered damages in an amount to be proven at trial, plus pre-judgment and post-judgment interest, punitive damages, costs and such other relief as the Court determines to be necessary.

### COUNT VI
### (Fraud Against Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer)

238.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

239.    As set forth more fully above, Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage knowingly or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding BRC's operations, investment strategy, and liquidity.

240.    Specifically, Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage materially misrepresented, among other things: (i) BRC utilized three trading strategies, all of which involved equities and equity options; (ii) BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors; (iii) by using this strategy, BRC historically had consistent profitable returns since inception; (iv) BRC was overseen by both a third-party

independent Administrator, Nottingham, and third-party independent Auditor, Sanville; and (v) Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC.

241.    Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage made these misrepresentations in, among other places, the April 4, 2016 Slide Deck, the PPM, the 2016 Investor Presentation, the 2016 Tear Sheets, the 2018 Investor Presentation, and the 2018 Tear Sheets, written and oral presentations, and emails to Surefire and the A Funds as alleged in detail above.

242.    When they made their false statements and committed their omissions, Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.

243.    Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage made the false representations knowing of their falsity and with the intent to induce Surefire to rely upon the false representations in deciding to invest in the Fund.

244.    Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. Koppenheffer, and Mr. McCormack knew these representations were false when made and that Surefire would rely on these representations in deciding to invest in BRC.

245.    Surefire reasonably relied on these representations in making their initial investment in BRC, and could not, through the exercise of reasonable diligence, discover that these representations were false.

46

246.    As a direct and proximate result, Surefire has suffered damages in an amount to be proven at trial.

## COUNT VII
### (Aiding and Abetting Fraud Against Nottingham and Sanville)

247.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

248.    As detailed above, and as specifically set forth in Paragraphs 21 through 204, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer perpetrated a massive fraud that included, among other things, making material misrepresentations about BRC in order to induce the A Funds and Surefire, to invest, make additional investments, or remain invested in BRC.

249.    Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack's, and Mr. Koppenheffer's representations about BRC were material to the A Funds' and Surefire's decision to invest in BRC, maintain their investments in BRC, and make additional investments in BRC.

250.    Nottingham and Sanville knew, or were reckless in not knowing, that Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer were perpetrating a fraud.  Specifically, Nottingham and Sanville knew - - based on their independent review of BRC's underlying financial records, including actual trading records and account statements - - Nottingham and Sanville knew that (i) BRC was not following the investment objectives, strategies and methods represented to the A Funds and Surefire; (ii) the bulk of BRC's assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; (iii) BRC was not utilizing a third-parties to assure that BRC's investments were supported by real assets and transactions;

(iv) that BRC did not offer monthly liquidity to investors; and (v) knew that Ms. Smith and her team were not investors in BRC.

251.    Nottingham and Sanville knowingly substantially assisted Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack's, and Mr. Koppenheffer's fraud.

252.    Nottingham made direct material misrepresentations to the A Funds and Surefire that: it had access to underlying information at BRC; it confirmed BRC's total AUM and/or verified and reconciled investor accounts; verified returns on a monthly basis before producing monthly statements; calculated the monthly NAV of the Fund; and verified Fund performance.  Nottingham also created phony account statements which it disseminated to Surefire and the A Funds based on the numbers Ms. Smith provided.

253.    Sanville issued a clean audit report for BRC that it knew was materially false and misleading for the year ending December 31, 2016.

254.    Both Nottingham and Sanville knew that the A Funds and Surefire would rely upon such reports and statements and would rely upon their professional expertise in deciding to invest in BRC, maintain their investments in BRC, and make additional investments in BRC.  Specifically, Nottingham and Sanville knew that the reports issued by it were the principal means by which investors were induced to purchase shares of the Fund, and not to redeem their shares, in that there was no other purportedly independently-verified information available to investors upon which they could rely.

255.    As alleged herein, Nottingham's and Sanville's reckless statements and representations aided and abetted Ms. Smith's fraud.  Nottingham recklessly disregarded numerous red flags, as previously described, and engaged in acts and omissions constituting a

gross departure from professional standards of care for an independent administrator. Nottingham's and Sanville's breaches of these standards of care, and its grossly negligent and reckless disregard for its professional standards and obligations, gave substantial assistance to Ms. Smith's accomplishment of the fraud.

256.    As a direct and proximate result of Nottingham's and Sanville's acts in furtherance of Ms. Smith's fraud, Surefire has suffered damages in an amount to be proven at trial.

257.    The conduct of Nottingham and Sanville, in substantially assisting and aiding and abetting Ms. Smith's fraud, as set forth above, was malicious, willful, wanton, and oppressive, and in reckless disregard of the rights of Surefire, thereby warranting the imposition of punitive damages against Nottingham in addition to the compensatory damages in accordance with the proof at trial.

## COUNT VIII
### (Negligent Misrepresentation Against Nottingham and Sanville)

258.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

259.    Nottingham issued false statements containing inflated NAV calculations and account balance information on a monthly basis.

260.    In issuing these statements, Nottingham acted negligently because it knew or had access to information indicating that its statements were not accurate.  Nottingham acted negligently by failing to check or verify the information received from Ms. Smith despite a duty to scrutinize and verify independently the information relating to the NAV and account balances. Nottingham's failure to check or verify the information was also negligent because it was aware

of the red flags surrounding BRC, including the consolidation of the roles of BRC, Bristol Advisors, and CV International, and Ms. Smith.

261.    Sanville issued the 2016 Independent Auditor's Report, which is addressed "To the Partners of Broad Reach Capital, LP."  The 2016 Independent Auditor's Report contained material misstatements of fact, including among other things that: (i) BRC's financial statements as of December 31, 2016 were prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"); (ii) Sanville conducted its audit in accordance with auditing standards generally accepted in the United States of America ("GAAS") (ii) BRC held certain positions in equities and options; and (iv) substantially all of BRC's security transactions, money balances, and securities positions are transacted with ICBC.

262.    In issuing these statements, Sanville acted negligently because it knew or had access to information indicating that its statements were not accurate.  Sanville acted negligently by failing to check or verify the information received from Ms. Smith, BRC, and CV Brokerage despite a duty to scrutinize and verify independently the information relating to the financial statements, as required by GAAS.

263.    Surefire justifiably relied on the information contained in Nottingham's statements.  Further, Nottingham was paid substantial fees for performing administrative services.

264.    As a direct and proximate result of Nottingham's and Sanville's conduct, Surefire has suffered damages in connection with its purchases of shares in BRC in an amount to be proven at trial.

## COUNT IX
**(Conversion Against Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, and CV Brokerage, and Investment Cons)**

265.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

266.    Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Investment Cons intentionally and unlawfully converted property of Surefire to their own use and benefit, to the harm and detriment of Surefire, as alleged herein.

267.    Specifically, as described in Paragraphs 109 to 121, records from both BRC and Nottingham show that $46,598,676.84 was withdrawn from Surefire's capital account as part of the redemption.

268.    The $46,598,676.84 is the property of Surefire.

269.    Surefire has demanded that Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Investment Cons return its $46,598,676.84.

270.    Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, and CV Brokerage, however, have failed to wire those funds to Surefire or account for their whereabouts.

271.    Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Investment Cons have wrongfully exerted dominion over Surefire's property (*i.e.*, the $46,598,676.84 in missing funds) in denial of and/or inconsistent with Surefire's rights.

272.     As a direct and proximate result of Ms. Smith's, Mr. Iregui's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's and Investment Cons' malfeasance, Surefire has suffered damages in an amount to be proven at trial.

## COUNT X
**(Aiding and Abetting Breach of Fiduciary Duty Against Bristol Advisors, Ms. Smith and Mr. Iregui)**

273.     Surefire repeats, realleges and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

274.     In acting or purporting to act as General Partner, Broad Reach Partners LLC owed fiduciary duties to Surefire by virtue of the PPM.  In addition, Surefire entrusted its investments to the General Partner who had substantial discretion and control over BRC's investment activities and assets and Surefire's investments. This discretion and control gave rise to a fiduciary duty and duty of care on the part of the General Partner to Surefire as evidenced by the following:

a.     The General Partner occupied a superior position over Surefire with respect to its management and control over their investments in the Fund and had superior access to confidential information about BRC's investments and assets; and,

b.     The General Partner's superior position necessitated that Surefire repose their trust and confidence in the General Partner to fulfill its duties, particularly with respect to BRC's investment activities and asset management, and Surefire did so by investing in the Fund.

275.     Bristol Advisors, Ms. Smith, and Mr. Iregui were aware of the fiduciary duties owed by the General Partner to Surefire as alleged above and that the General Partner was breaching its fiduciary duty to Surefire.

276.     By their conduct, Bristol Advisors, Ms. Smith, and Mr. Iregui knowingly participated, substantially assisted, and encouraged the General Partner to breach its fiduciary duties to Surefire as described above.

277.    As a direct and proximate result of (i) the General Partner's breaches of fiduciary duties; and, (ii) Bristol Advisors', Ms. Smith's, and Mr. Iregui's aiding and abetting those breaches, Surefire has suffered damages in an amount to be proven at trial.

## JURY DEMAND

Surefire demands trial by jury on all counts for which a jury trial is permitted.

## REQUEST FOR RELIEF

WHEREFORE, Surefire respectfully requests that the Court:

A.    Preliminarily enjoin Defendants from conveying, transferring, alienating, selling, hypothecating, encumbering, disposing or paying any accounts, payables or other sums, amounts, income or funds up to the amount of $46,598,676.84;

B.    Order a general attachment on all assets of Defendants in the amount of $46,598,676.84;

C.    Award Surefire damages in the amount of $46,598,676.84;

D.    Award Surefire prejudgment and post judgment interest;

E.    Award Surefire its reasonable attorney's fees and costs; and,

F.    Award such other relief as the Court deems just and proper.

David Smith (atty. I.D. 21480)
Ira Neil Richards (atty. I.D. 50879)
Daniel P. Lawn (atty. I.D. 326114)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2503
Irichards@schnader.com

ATTORNEYS FOR PLAINTIFF

*Pro hac vice* pending:
William C. Nystrom
Dana A. Zakarian
Nina S. Hirsch
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210
Telephone: (617) 778-9100
wnystrom@nbparis.com
dzakarian@nbparis.com
nhirsch@nbparis.com

Dated: September 6, 2019

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| | : **Civil Action No.** |
| Plaintiff, | : |
| v. | : **Complaint for Violations of the** |
| | : **Federal Securities Laws** |
| | : |
| **BRENDA A. SMITH, BROAD REACH** | : **Jury Trial Demanded** |
| **CAPITAL, LP, BROAD REACH** | : |
| **PARTNERS, LLC, and BRISTOL** | : |
| **ADVISORS, LLC,** | : |
| | : |
| Defendants. | : |
| | : |
| | : |

Plaintiff Securities and Exchange Commission (the "Commission"), One Penn Center, 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103, alleges as follows against the following defendants, whose names and last known addresses are set forth below:

a. Brenda A. Smith
   222 West Rittenhouse Square
   Penthouse 3
   Philadelphia, PA 19103

b. Broad Reach Capital, LP
   200 Four Falls, Suite 211
   1001 Conshohocken State Road
   West Conshohocken, PA 19428

    c.  Broad Reach Partners, LLC
        200 Four Falls, Suite 211
        1001 Conshohocken State Road
        West Conshohocken, PA 19428

    d.  Bristol Advisors, LLC
        200 Four Falls, Suite 211
        1001 Conshohocken State Road
        West Conshohocken, PA 19428

## **SUMMARY**

1.    This case involves an investment advisory fraud in which Brenda A. Smith and the other Defendants solicited over $100 million from investors for purported investment in sophisticated securities trading strategies.  However, Smith took the vast majority of these funds for unrelated companies, to pay back other investors, and for personal use.  And, in 2019, confronted with at least one investor trying to redeem its investment, Smith created a fictitious valuation of assets backed by false claims that she held billions of dollars in assets through a company she owned.

2.    From at least February 2016 through the present, Smith, defendant Broad Reach Capital, LP ("Broad Reach Fund" or the "Fund"), defendant Broad Reach Partners, LLC ("Partners"), and defendant Bristol Advisors, LLC ("Bristol")

2

(collectively, without Smith, the "Entity Defendants"), engaged in this fraud. Smith dominated and controlled the Entity Defendants such that they were essentially her alter egos.

3.    Through the Entity Defendants, Smith offered limited partnership interests in the Fund to investors beginning in early 2016.  Since the Fund's inception, Smith raised approximately $105 million from at least 40 investors, and investors are still owed more than $63 million in principal.

4.    To solicit and retain investors, Defendants represented that the Fund employed several profitable, sophisticated trading strategies involving highly liquid securities, including those that it was uniquely positioned to pursue because of its access to the Philadelphia Stock Exchange trading floor ("Trading Strategies").  In reality, only a small fraction of investor money was actually used for these strategies.

5.    The vast majority of the funds were moved through the bank accounts of entities Smith controls and ultimately used to, among other things, make her own personal investments and to repay other investors.  To lull existing investors and solicit additional investments, Defendants provided monthly account statements reflecting high returns and "tear sheets" touting the Fund's overall

3

claimed 30%+ yearly return and that the Fund had never had a losing month.

These and other performance statements were false.

6.      In recent months, several investors have tried—in vain—to redeem.

In July 2019, in response to investors' concerns, Defendants distributed a

document valuing the Fund's assets at over $180 million ("Asset List").  To

support this valuation, Smith claimed that she owned a $2.5 billion bond issued by

a publicly traded financial institution (the "Bond") and had transferred $100

million of the Bond to the Fund.  She even provided purported brokerage

statements reflecting the supposed $2.5 billion holding.  But the documents are

fake, and thus, more than $100 million of claimed holdings of the Fund are an

obvious fiction.  The vast majority of investors' money is gone from the Fund.

7.      The Defendants engaged in a fraudulent scheme and made material

misrepresentations and omissions to investors and prospective investors.  Smith

and Bristol also abused their position and breached their fiduciary duties as

investment advisers by making material misrepresentations and omissions and

failing to act in the best interest of the Fund.

8.      By engaging in the conduct described in this Complaint, Defendants

violated, directly or indirectly, and unless enjoined will continue to violate, Section

4

17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section

10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §

78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  In addition, because

Smith and Bristol are investment advisers, by engaging in the conduct described in

this Complaint, they also violated, directly or indirectly, and unless enjoined will

continue to violate, Sections 206(1), (2), and (4) of the Investment Advisers Act of

1940 ("Advisers Act") [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17

C.F.R. § 275.206(4)-8].

## JURISDICTION AND VENUE

9.     The Commission brings this action pursuant to Sections 20(b) and

20(d) of the Securities Act [15 U.S.C. §§ 77t(b), (d)], Sections 21(d) and 21(e) of

the Exchange Act [15 U.S.C. §§ 78u(d), (e)], and Sections 209(d) and 209(e) of the

Advisers Act [15 U.S.C. §§ 80b-9(d), (e)] to enjoin such acts, practices, and

courses of business, and to obtain disgorgement, prejudgment interest, civil money

penalties, and such other and further relief the Court may deem just and appropriate.

10.     This Court has jurisdiction over this action pursuant to Sections 20(b),

20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), (d), and 77v(a)];

Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and

78aa]; and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C.

§§ 80b-9(d), (e), 80b-14].  Defendants, directly or indirectly, made use of the

mails, or the means and instrumentalities of interstate commerce, or the facility of

national security exchanges, in connection with the transactions, acts, practices,

and courses of business alleged in this complaint.

11.    Venue in this district is proper under Section 27 of the Exchange Act

[15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b), because certain acts, practices,

transactions, and courses of business constituting violations of the federal

securities laws occurred within the District of New Jersey.  In connection with the

fraud, Defendants sent, and/or caused to be sent, wire transmissions through the

Fedwire Funds Service, which involved electronic communications between

Federal Reserve facilities in New Jersey and Texas.

## THE DEFENDANTS

12.    Brenda A. Smith, age 60, is an individual who, upon information and

belief, resides in Philadelphia, Pennsylvania.  Smith owns and/or controls the

Entity Defendants and many other entities.  Smith operated all of the Entity

Defendants out of the same office space in West Conshohocken, Pennsylvania.

During the relevant period, Smith owned, controlled, and/or exercised dominion

6

over the Entity Defendants making them essentially her alter egos.  Until recently,

Smith owned CV Brokerage, Inc., a registered broker-dealer, and held Series 7, 24,

27, 53, 63, 79, and 99 licenses.  On July 2, 2019, the Financial Industry Regulatory

Authority ("FINRA") accepted a letter of Acceptance, Waiver, and Consent from

Smith by which she agreed to be barred by FINRA in light of her failure to respond

to a written request for documents and information pursuant to FINRA Rule 8210.

13.    Broad Reach Capital, LP (also referred to as "Broad Reach Fund" or

"Fund") is a Delaware limited partnership established by Smith in February 2016

and operates as a purported hedge fund.  The Fund's principal place of business is

in West Conshohocken, Pennsylvania.

14.    Broad Reach Partners, LLC (also referred to as "Partners") is a

Delaware limited company with its principal place of business in West

Conshohocken, Pennsylvania.  It serves as the general partner for the Fund.

Partners has no employees other than Smith and conducts no business other than

serving as the Fund's general partner.  Partners passed much of the money invested

in the Fund through its bank account to entities or accounts controlled by Smith.

15.    Bristol Advisors, LLC (also referred to as "Bristol") is a Delaware

limited liability company with a principal place of business in West

Conshohocken, Pennsylvania.  It is a registered investment advisor that purports to

provide investment advisory services to its sole client, the Fund.  Smith is the sole

owner of Bristol and the person who makes all advisory decisions for Bristol.

Bristol has no business operations other than advising the Fund.

## RELEVANT PERSONS AND ENTITIES

16.    CV International Investments, Ltd., is a purported UK company with

its principal place of business in London, UK.  Smith formed CV International and

controls it.

17.    "Investor 1" is an individual residing in Florida.  Investor 1 invested

his own assets with the Fund.

18.    "Investor 2" is an individual residing in Puerto Rico.  Investor 2

invested assets of investment vehicles he controlled with the Fund.  Later, he

combined and merged these investments into an investment made by Investor 3.

19.    "Investor 3" is a limited partnership with its principal place of

business in Montreal, Canada.

## FACTS

### A. Smith Controlled the Entity Defendants and Misused Investor Funds

20.     Smith dominated and controlled each of the Entity Defendants—the Fund, Partners, and Bristol—such that they were essentially her alter-egos.  She controlled their brokerage and bank accounts, and every other aspect of the businesses.  In addition, during the period February 2016 to the present, Smith also controlled or had signatory authority on the brokerage and/or bank accounts of at least 35 additional entities.

21.     Defendants offered limited partnership interests in the Fund to investors.  Defendants raised approximately $105 million from at least 40 investors since the Fund's inception.

22.     Defendants represented to investors and prospective investors that the Fund would invest their assets in the Trading Strategies, which involved highly liquid securities and which Defendants claimed the Fund was uniquely positioned to pursue.

23.     However, contrary to those representations, investors' money rarely ended up in the brokerage accounts participating in the Trading Strategies that

Defendants had touted and promised.  Defendants used only a small fraction of the money received from investors to engage in the Trading Strategies.

24.    Instead, Defendants funneled the bulk of investor funds through a web of entities Smith controlled.  Ultimately, Smith used the funds to make her own apparent investments wholly unrelated to the Trading Strategies.  There is no evidence that the Fund owns any of these other investments.

25.    Unbeknownst to investors, Defendants also used some of the money they had invested to pay other investors seeking to redeem.  Further, since the Fund's inception, Smith used over $2 million of the Fund's assets (filtered through three of her entities) to pay American Express bills.  None of this capital was engaged in the claimed profitable Trading Strategies.

26.    Indeed, although investors contributed approximately $105 million to the Fund, the high point of all brokerage and bank accounts in the name of the Fund and its purported affiliates was no more than $31.8 million in December 2016.

27.    Since December 2016, the total assets within bank and brokerage accounts of the Broad Reach Fund have steadily declined, even as tens of millions of new investment money poured into the Fund.

10

**B. Defendants Made Material Misrepresentations and Omissions to Induce Investors to Invest**

**1. The Fund's Written Materials Marketed the Trading Strategies to Potential Investors**

28.     According to the Fund's Private Placement Memoranda ("PPM"), the Fund's investment objective and strategy is to "invest its account with managers that represent a diverse set of assets" that would include "equities, bonds, options, commodities, foreign exchange, and energy."

29.     In other documents Defendants provided to investors, created by Smith or at her direction, Defendants presented an even narrower focus, stating that the Fund would invest in the Trading Strategies.  For example, the Fund's "Investor Presentation," dated February 2018, made clear that the Fund's strategy was an equities trading strategy designed to "[i]dentify, utilize, monitor and manage the managers who execute risk strategies through proven mathematical models to generate positive uncorrelated returns."  A series of "[c]ompetitive advantages" listed in the presentation exclusively referred to securities trading. The presentation also provided detailed charts relating to the three primary securities trading strategies:  Dividend Capture, Short-Term Opportunistic Trading, and VIX Convergence.

11

30.     In or about October 2016, Defendants provided a "tear sheet" (a single-page document touting the returns of the Fund's Trading Strategies) to certain current and prospective investors, including Investor 2.  This tear sheet purported to reflect the Fund's historical performance and mentioned no investments other than the Trading Strategies.

31.     The tear sheet also posed the rhetorical question "Why Broad Reach," and went on to tout its "Distinctly Different Trading Strategies," "direct access to floor traders," and "specialized" trades.

32.     Similarly, Defendants provided a March 31, 2018 "tear sheet" to certain current and prospective investors (including Investor 2), purporting to reflect the Fund's historical performance.  Again, the tear sheet mentioned no investments other than the Trading Strategies, and touted an "efficient execution platform" and "high level of liquidity," noting that "[t]he current portfolio of strategies include Dividend Capture, VIX Convergence, Volatility Skew, S&P Premium Capture, Opportunities and Intraday Trading."  Each of these is a securities trading strategy.

33.     Both the Investor Presentation and the tear sheets also boasted of the Fund's steady, positive returns.  They included a chart reflecting that each month

12

since January 2015 (which predates the origin of the Fund itself by approximately

a year) the Fund had positive returns, with the 2018 documents claiming annual

returns of over 35% in 2016 and 33% in 2017.  The presentation and 2018 tear

sheet also asserted that the Fund had a positive return of 6.07% in the first three

months of 2018, including a gain of 1.76% for February 2018.

34.    In reality, the limited funds invested in the Trading Strategies declined

by over 50% in February 2018.  And, even when the Trading Strategies were

profitable, there was simply not enough money devoted to them to generate the

claimed positive returns for the overall Fund.

### 2.  Defendants Defrauded Investors 1, 2, and 3

35.    The specific experiences of three of Defendants' largest investors are

illustrative of the fraud.

### a.  Investor 1

36.    Investor 1 invested approximately $9.5 million in the Fund with the

understanding, based on representations by Smith and written documentation

concerning the Fund she provided, that his capital would be allocated to the

Trading Strategies.

13

37.     Investor 1 confirmed this understanding in a December 1, 2016 side letter agreement, a document permitted by the Fund's Private Placement Memorandum.  That side letter specifically stated that Investor 1's investment would be allocated to the Trading Strategies and required Defendants to provide Investor 1 with written notice if any material changes in the Trading Strategies were made.  A list of the referenced Trading Strategies was attached to the side letter, which Smith signed on behalf of the Fund.

38.     Despite the side letter and other representations, Defendants only used a small portion of Investor 1's funds in the Trading Strategies.

39.     For example, between December 19, 2016 and January 23, 2017, Defendants received over $8.9 million in new funds from investors into the Fund's bank account (as well as a $1 million transfer from a brokerage account), of which $5.6 million was an investment made by Investor 1.  However, only $550,000 of the $9.9 million was transferred to Fund brokerage accounts for trading.

40.     Instead, Defendants transferred over $8.7 million of that investor capital to other entities that Smith controlled.  Smith appears to have used this money for, among other things, a mining and mineral company and a restaurant, entities with no relation to the Trading Strategies.

14

41.     There is no evidence that these entities were owned by the Fund, and bank records do not reflect that they paid any returns to the Fund.  Moreover, these entities are not even identified as "investments," either in the Fund's 2016 Financial Statements disseminated to investors or on the Asset List distributed to investors in July 2019.  Smith simply took these funds for her own personal investment or use.

### b.  Investor 2

42.     Investor 2 understood from the Defendants that his investment would be used exclusively to trade securities using the Trading Strategies.  Defendants sent Investor 2 documents, touting the uniqueness of the Trading Strategies and their historically high returns, to induce investment.

43.      During a September 2016 meeting with Investor 2, Smith created a handwritten document for Investor 2 representing that the Fund derived all revenue and returns from the Trading Strategies.

44.     Investor 2 also received the false March 31, 2018 tear sheet with the fabricated February 2018 returns.

15

45.     Investor 2 invested over $26.7 million with the Fund, in a series of payments over time, on behalf of certain investment funds he managed, including his family partnership.

46.     Defendants routinely used capital obtained from Investor 2 for purposes other than the Trading Strategies.  For instance, on July 5, 2017, Investor 2 wired $3 million to the Fund's bank account.  Within three days, over $2.2 million of that capital was transferred to other entities controlled by Smith, including $1.8 million to an entity that Smith utilized for her own investments.

47.     In May 2018, Investor 2 wired $5.43 million to the Fund's bank account, again with the understanding that this capital would be used in the Trading Strategies.  However, none of this money was transferred to a Fund brokerage account.  Instead, within weeks, Defendants transferred roughly half of Investor 2's funds to other entities controlled by Smith, and used the other half to fund redemptions by other investors in the Fund.

### c.  Investor 3

48.     Defendants similarly made oral and written misrepresentations to Investor 3 concerning the use of his investment funds.  To signify that its investment would involve the "dividend capture" trading strategy of the Fund,

16

Investor 3 went so far as to name the entity making the investment the "Dividend Capture" fund.

49.    As with Investor 1 and Investor 2, Defendants used only a small fraction of Investor 3's funds in any kind of securities trading.  Investor 3 first invested $2.285 million in late December 2018, transferring the funds to the Fund's bank account at a time when the balance in the account was less than $1,000.

50.    By January 15, 2019, Defendants had exhausted the more than $2 million invested by Investor 3, but had transferred only $31,875 to brokerage accounts.  Instead, Defendants caused the transfer of approximately $1.36 million to other entities Smith controlled and wired $1 million to a real estate firm, each with no relation to the Trading Strategies.

51.    On January 29, 2019, Investor 3 invested another $2 million in the Fund, wiring the money to the Fund's bank account at a time when the balance in the account was less than $75.  That same day, Defendants wired $2 million to another investor in the Fund with an outstanding redemption request.

52.    Two days later, on January 31, 2019, Investor 3 wired an additional $225,000 to the Fund's bank account.  That same day, Defendants wired the funds

obtained from Investor 3 to the aforementioned Fund investor to fund a redemption request.  None of Investor 3's January 2019 investments were deposited into a brokerage account for the purpose of conducting the Trading Strategies.

53.     Smith also misled Investor 3 regarding the Fund's historical performance during Investor 3's due diligence process.  During an August 30, 2018 phone call, Smith misrepresented to Investor 3 that the Fund's Trading Strategy relating to volatility had produced a substantial profit in February 2018.  To the contrary, the Fund's brokerage accounts suffered massive losses in February 2018, with the primary Broad Reach account losing over 50% of its value, dropping from approximately $17.7 million to approximately $8.8 million by the end of the month.

## C. Defendants Have Continued to Make Material Misrepresentations and Omissions About the Fund's Assets

54.     In approximately February 2019, Investor 2 transferred his investment in the Fund to Investor 3.  After this transfer, the Fund's books and records reflected that the total value of Investor 3's holdings was approximately $46.6 million.  This included all principal and purported investment gains for Investors 2 and 3.

18

55.     Shortly therafter, Defendants took issue with the transfer.  As a result of this dispute, in March 2019, Investor 3 decided to fully redeem the combined $46.6 million investment in the Fund.  Defendants accepted Investor 3's redemption request and stated that the funds would be wired on May 15, 2019.

56.     The Fund did not redeem Investor 3 on May 15, however, and Smith has made various excuses as to why the Fund has not fulfilled the redemption request.  Finally, on May 31, 2019, Defendants, still having failed to return Investor 3's investment, instead provided Investor 3 with what Smith claimed was the Fund's "proof of funds" to assure Investor 3 that his capital was intact.

57.     This "proof of funds" was a purported board resolution by CV International Investments Limited ("CV International"), another entity owned by Smith and unconnected to the Fund.  The resolution stated that CV International had transferred $100 million worth of a bond to the Fund, effective December 31, 2017.  Smith signed the document as a Director of CV International.

58.     Later that same day, Defendants emailed a purported bank statement to Investor 3 indicating that CV International owned $2.5 billion of the Bond referred to in the corporate resolution.  Defendants sent these documents to support the assertion that CV International—the supposed owner of the $2.5 billion

19

Bond—had transferred $100 million worth of the Bond to the Fund in December 2017, and thus, the Fund had sufficient capital to satisfy redemption requests.

59.     Defendants also provided the Asset List—a one-page document listing the fund's purported assets as of June 30, 2019—to Investor 3.  According to the Asset List, as of June 30, 2019, the Fund's assets were valued at over $180 million, with the largest asset being $129.56 million of the Bond.

60.     Defendants listed the value of the Fund's brokerage account at only approximately $2.6 million, but even this limited amount was false.  The actual June 2019 balance of the Fund's brokerage account was approximately $652,000.

61.     Soon after, apparently spurred by other investors seeking redemptions, Defendants provided the Asset List to other investors in the Fund.

62.     Smith's continuing claim that her entity, CV International, owns (or recently owned) $2.5 billion worth of the Bond is false and the brokerage statement indicating CV International's ownership is a fiction.

63.     Public records indicate that the entire issuance of the Bond was valued at $2.5 billion.  The real Bond is a liquid security that is actively traded in United States and international bond markets.  Public records show that there are multiple, large institutional holders of the Bond.  Conversely, there is no public record that

20

indicates that CV International, Defendants, or any other known entity controlled by Smith owns any of the Bond, let alone the entire issuance.  Smith's claims that $100 million of the Bond's value (now inexplicably valued at over $129 million) was transferred to the Fund and represents 71% of the Fund's assets, are simply false.

64.     The majority of the Fund's other listed assets on the Asset List are also dubious.  For instance, the Fund's second largest purported asset is $20.25 million in "securitized cryptocurrency."  Attempting to substantiate this claim, Defendants provided Investor 3 with only a two-page, unintelligible document entitled "Wallet," which shows a few lines of text with dollar figures.  Fund bank records do not reflect the purchase of this purported asset.

65.     Defendants are covering up a massive shortcoming in the Fund caused by the misuse of investor funds and losses generated by the Trading Strategies. Putting aside the outlandish and inaccurate claims of 30% plus yearly gains, of the approximately $105 million invested in the Fund, based on amounts returned to investors, almost always from other investors' money, the Fund still owes investors more than $63 million in principal.

21

66.     There is no evidence that assets sufficient to satisfy that obligation are currently held by the Fund or any other affiliated entity.

**D. Defendants Violated The Anti-Fraud Provisions of the Federal Securities Laws**

67.     During the relevant period, Smith operated, controlled, and dominated the Entity Defendants such that they were essentially her alter egos.

68.     The limited partnership interests in the Fund sold by Defendants are investment contracts, and therefore securities.  Likewise, Defendants' fraudulent scheme concerned investing in securities.

69.     All of the misrepresentations and omissions set forth herein, individually and in the aggregate, are material.  There is a substantial likelihood that a reasonable investor would consider the misrepresented facts and omitted information regarding how their money would be invested, how the supposed investments performed, the value of those investments, and the ability to repay those investments important, and/or that disclosure of the omitted facts or accurate information would alter the "total mix" of information available to investors.

70.     In connection with the conduct described herein, Defendants acted knowingly and/or recklessly.  Among other things, Defendants knew or were

22

reckless in not knowing that they were making material misrepresentations and omitting material facts in connection with selling or offering of securities.

71.    Smith and the Entity Defendants had ultimate authority for their false and misleading statements and omissions made orally and in documents provided to clients and prospective clients.

72.    Defendants knowingly and/or recklessly disseminated false and misleading statements to investors and prospective investors with the intent to deceive.

73.    Through their material misrepresentations and omissions, Defendants knowingly, recklessly, or negligently obtained money or property from investors.

74.    Through this scheme, Defendants knowingly and/or recklessly engaged in acts, transactions or courses of business that operated as a fraud or deceit upon their investors and client.

75.    Smith and Bristol acted as investment advisers during the relevant period by providing investment advisory services for a fee.

76.    Smith and Bristol provided investment advisory services to a pooled investment vehicle, the Fund.

77.     In connection with the conduct described herein, Smith and Bristol

breached the fiduciary duty they owed to the Fund.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
### **Violations of Section 17(a) of the Securities Act**
### **(Against All Defendants)**

78.     The Commission realleges and incorporates by reference each and

every allegation in paragraphs 1 through 77, above, as if the same were fully set

forth herein.

79.     From at least February 2016 through the present, as a result of the

conduct alleged herein, Defendants knowingly or recklessly or, with respect to

subparts b and c below, negligently, in the offer or sale of securities, directly or

indirectly, by the use of the means or instruments of transportation or

communication in interstate commerce, or the means or instrumentalities of

interstate commerce, or the mails, or the facilities of a national securities exchange:

a.     employed devices, schemes or artifices to defraud;

b.     obtained money or property by means of, or made, untrue

statements of material fact, or omitted to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were

made, not misleading; or

       c.    engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

80.    By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
## (Against All Defendants)

81.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 77 inclusive, as if they were fully set forth herein.

82.    By engaging in the conduct described above, from February 2016 to the present, Defendants directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchanges, in connection with the purchase and sale of securities described herein, knowingly or recklessly:

       a.    employed devices, schemes, or artifices to defraud;

25

      b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.    engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

83.    Defendants knowingly, intentionally, or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  By engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

84.    By reason of the foregoing, Defendants, directly and indirectly, violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Section 206(1) and (2) of the Advisers Act
### (Against Defendants Smith and Bristol)

85.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 77, above, as if the same were fully set forth herein.

86.     From at least February 2016 through the present, as a result of the conduct alleged herein, Defendants Smith and Bristol, knowingly or recklessly or, with respect to subpart b below, negligently, as investment advisers, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails:

        a.      employed devices, schemes or artifices to defraud any client or prospective client;

        b.      engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

87.     By engaging in the foregoing conduct, Defendants Smith and Bristol violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)].

27

## FOURTH CLAIM FOR RELIEF
### Violations of Section 206(4) of the Advisers Act and Rule 206-4 thereunder
### (Against Smith and Bristol)

88.   The Commission realleges and incorporates by reference each and
every allegation in paragraphs 1 through 77, above, as if the same were fully set
forth herein.

89.   Defendants Smith and Bristol, by engaging in the conduct described
above, directly or indirectly, by use of means or instrumentalities of interstate
commerce or use of the mails, which acting as investment advisors, engaged in
acts, practices, or courses of business that were fraudulent, deceptive, and
manipulative.

90.   Defendants Smith and Bristol, while acting as investment advisers to
pooled investment vehicles:  (a) made untrue statements of material facts or
omitted to state material facts necessary in order to make statements made, in light
of the circumstances under which they were made, not misleading, to investors or
prospective investors in the pooled investment vehicle; or (b) engaged in acts,
practices, or courses of business that were fraudulent, deceptive, or manipulative
with respect to investors or prospective investors in the pooled investment vehicle.

28

91.    By reason of the foregoing, Defendants Smith and Bristol violated and, unless restrained and enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and permanently restraining and enjoining Smith and Bristol from violating Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### II.

Ordering disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws;

**III.**

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)], and, as to Defendants Smith and Bristol, pursuant to

Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**IV.**

Granting such other and further relief as this Court may determine to be just

and necessary.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff

demands that this case be tried to a jury.


Respectfully submitted,

By: /s/ John V. Donnelly III

Kelly L. Gibson
Scott A. Thompson
John V. Donnelly III
Mark R. Sylvester

Securities and Exchange Commission
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
Email: DonnellyJ@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**

Dated: August 27, 2019

31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>   v.<br><br>BRENDA A. SMITH, et al.,<br><br>        Defendants. | Case No.<br><br>**DESIGNATION OF AGENT FOR SERVICE** |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action.  Therefore, service upon the United States or its authorized designee, David Dauenheimer, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor,

Newark, NJ 07102 shall constitute service upon the Commission for purposes of

this action.

Respectfully submitted,

s/ Scott A. Thompson
Scott A. Thompson

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(215) 597-3100
ThompsonS@sec.gov

# EXHIBIT E

## Administration Services Agreement

This Administration Services Agreement is made and entered into this 1st day of February 2016, by and among Innovative Fund I, a Delaware limited partnership (the "Fund"), and The Nottingham Company, a North Carolina corporation (the "Administrator").

### WITNESSETH THAT:

WHEREAS, the Fund is exempt from registration under Section 4(2) of the Securities Act of 1933; Rule 506 of Regulation D under the Securities Act of 1933; Section 3(c) of the Investment Company Act of 1940; or other available federal and state exemptions;

WHEREAS, the Fund wishes to retain the Administrator to provide, or procure, certain services to the Fund in the manner and on the terms described in this agreement; and

WHEREAS, the Administrator is willing to furnish or arrange for such services on the terms and conditions described in this agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this agreement and intending to be legally bound, the Fund and the Administrator do mutually promise and agree as follows:

1. <u>Services.</u> The Fund engages the Administrator to perform certain accounting, recordkeeping, and other services for the Fund. The Administrator accepts such appointment and agrees to perform the services in accordance with the terms and conditions of this agreement.

2. <u>Responsibilities of the Administrator.</u> The Administrator shall provide, or cause to be provided by others, the services listed in Exhibit A of this agreement.

   Notwithstanding anything contained in this agreement to the contrary, the Administrator (including its directors, officers, employees, and agents) shall not be required to perform any of the investment advisor duties of, assume any of the obligations or expenses of, or be liable for any of the acts or omissions of, any investment advisor of the Fund. It is the express intent of the parties that the Administrator shall not have control over or be responsible for the placement, investment, or reinvestment of the assets of the Fund. The Administrator may from time to time, upon the prior written consent of the Fund, obtain, at the Administrator's own expense, the services of consultants or other third parties to perform part or all of the Administrator's duties under this

agreement, and such parties may be affiliates of the Administrator. The retention of a consultant or other third party by the Administrator to perform the Administrator's duties shall not relieve the Administrator of any of the Administrator's responsibilities under this agreement.

3. **Services Not Exclusive.** The services furnished by the Administrator under this agreement are not deemed exclusive, and the Administrator shall be free to furnish similar services to others.

4. **Books and Records.** The Administrator agrees to maintain normal and customary records in connection with its duties specified in this agreement and that such customary records shall be the property of the Fund. The Administrator agrees to make available to or surrender such customary records promptly to the Fund upon the Manager's request. The Administrator shall be entitled to keep copies of any records that the Administrator may be required to retain by law or regulation.

The records maintained by the Administrator in connection with its duties specified in this agreement shall be treated as confidential. In case of any request or demand for the inspection of such records by another party, the Administrator will notify the Manager and follow the Manager's instructions with respect to permitting or refusing such inspection; provided, however, that the Administrator may exhibit such records to (i) the Manager, the Fund's investment advisors, and other service providers as the Administrator deems appropriate, (ii) the Securities and Exchange Commission or other governmental agency if requested by such agency, and (iii) any other person in any case where it is reasonably advised by its counsel that it may be held liable for failure to do so, unless (in cases involving potential exposure only to civil liability) the Fund has agreed to indemnify the Administrator against such liability.

5. **Allocation of Charges and Expenses.**

    (a) The Administrator shall furnish at its own expense the executive, supervisory, and clerical personnel necessary to perform its obligations under this agreement.

    (b) The Fund assumes and shall pay, or cause to be paid, all other expenses related or applicable to the Fund not otherwise allocated in this agreement, including, without limitation, the following expenses:

        i. taxes;
        ii. interest;
        iii. custodian fees and expenses;

2

iv. brokerage fees and commissions, dealer markups, and other expenses in connection with the acquisition or disposition of securities or other investments;

v. investment advisory fees and expenses;

vi. auditing, accounting, and legal expenses;

vii. cost of maintenance of its existence as a legal entity;

viii. cost of special forms, stationery, and telephone services;

ix. cost of qualifying to do business in any jurisdiction in which it may be required to do so;

x. costs of meetings;

xi. Federal and state registration fees and expenses;

xii. costs of setting in type, printing, and mailing informational memoranda, reports, and notices;

xiii. third party storage fees of its files and records (except for fees relating to the storage of its files and records by or at the request of the Administrator); and

xiv. insurance.

6. <u>Compensation.</u> For the services provided and the expenses assumed by the Administrator under this agreement, the Administrator shall be entitled to the fees and expenses set forth on Exhibit B of this agreement. The Administrator shall calculate the compensation to which it is entitled under this agreement and direct the disbursement of such compensation from the Fund. In addition, the Administrator shall be entitled to reimbursement of actual out-of-pocket expenses reasonably incurred by the Administrator on behalf of the Fund for those expenses for which the Fund is responsible for paying upon the presentation of satisfactory back-up documentation by the Administrator to the Fund. The Administrator shall be entitled to additional compensation for any special projects or services not included in this agreement and requested by the Fund, such projects and services and the Administrator's compensation to be mutually agreed upon in writing.

7. <u>Authorized Agent.</u> In order to facilitate payment of the expenses and compensation specified in Sections 5 and 6 above, the Fund shall authorize Administrator as the Fund's agent to make payments and withdrawals of funds as the Administrator may order and direct, including payments to the Administrator, from the Fund's prime brokerage, custody, and demand deposit accounts. The Fund shall further authorize the Administrator to (i) access the Fund's account information (including position and balance

3

information); (ii) utilize one or more electronic payment systems provided in connection with such accounts for payments and transfers of funds from the accounts; and (iii) enter into any agreement regarding access to the accounts with the provider of such accounts.

8. <u>Limitation of Liability and Indemnification.</u>

(a) <u>Limitation of Liability.</u> The duties of the Administrator shall be confined to those expressly set forth in this agreement, and no implied duties are assumed by or may be asserted against the Administrator. The Administrator shall not be liable for any loss, damage, or liability related to or resulting from the placement, investment, or reinvestment of assets of the Fund or the acts or omissions of the Manager, Fund, or any other third party subject to separate agreements with the Manager or Fund, unless and only to the extent that the Administrator would be liable pursuant to the next sentence. Except as provided in paragraph (c) of this section, the Administrator shall not be liable for any error of judgment, mistake of law, or any loss or damage suffered by the Manager or the Fund in connection with the performance of this agreement, any investment, or any act or omission of the Administrator in carrying out its duties under this agreement or any related agreement with a third party, except a loss or damage resulting directly from willful misconduct, negligent conduct or bad faith on the part of the Administrator in the performance of its duties under this agreement.

For purposes of paragraphs (a) and (b) of this section, the term "Administrator" shall include the Administrator, directors, officers, employees, and other agents of the Administrator, as well as any consultants or third parties who are engaged to perform all or any part of the Administrator's duties pursuant to Section 2 of this agreement.

(b) <u>Indemnification of the Administrator.</u> Except as otherwise provided in paragraph (a) of this section, the Administrator shall not be liable for (i) acting in accordance with instructions or specifications (including without limitation, written email) from the Manager or the Fund or any agent of the Manager or the Fund, or (ii) the acts or omissions of nominees, correspondents, designees, agents, or subagents of the Manager or the Fund.

(i) The Fund shall indemnify the Administrator and hold it harmless against any and all claims, losses,

liabilities, damages, fines, penalties, interest, and expenses (including reasonable attorneys' fees and expenses) arising from or in connection with this agreement or the performance of its duties under this agreement; provided, however, that nothing contained in this agreement shall require that the Administrator be indemnified for willful misconduct, negligent conduct or bad faith on the part of the Administrator.

The Administrator may consult with and obtain advice from suitable agents authorized by the Manager or the Fund to act on behalf of the Manager or the Fund, including auditors and legal counsel, and the Administrator shall not incur any liability in acting in good faith in accordance with the reasonable advice and opinion of such agents.

(ii) The Administrator's duties and responsibilities are solely those set forth in this agreement, including the exhibits to this agreement, and the Administrator shall not be obligated to perform any services or take any action not provided for in this agreement unless specifically agreed to by the Administrator in writing. Nothing contained in this agreement shall cause the Administrator to be deemed a trustee or fiduciary for or on behalf of the Manager or the Fund.

(iii) The Administrator shall not have any duty or responsibility to make recommendations, supervise, or determine the suitability of any transactions affecting any assets held by the Manager or the Fund.

(iv) The Administrator shall not be liable for, nor shall it be considered in breach of this agreement due to, any failure or delay in the performance of its obligations arising out of or caused directly or indirectly by circumstances beyond its reasonable control including, without limitation, acts of God, earthquakes, fires, floods, wars, civil or military disturbances, sabotage, riots, loss or malfunction of utilities, computer (hardware or software) or communications services, labor disputes, or acts of civil or military authorities.

(c) Indemnification of the Manager and the Fund. The Administrator agrees to indemnify and hold harmless the Manager and the Fund from any and all claims, losses,

liabilities, damages, fines, penalties, interest, and expenses (including reasonable attorneys' fees and expenses) incurred by the Manager or the Fund in connection with the defense or disposition of any matter related to or resulting from any willful misconduct, negligent conduct or bad faith on the part of the Administrator in the performance of its duties under this agreement.

(d) <u>Survivability.</u> The provisions contained in this agreement relating to indemnification shall survive the expiration or other termination of this agreement; shall be deemed to include and protect the Manager and the Fund and the Administrator and their respective members, directors, officers, employees, shareholders, members, managers, and agents; and shall inure to the benefit of their respective successors, assigns, and personal representatives.

9. <u>Duration and Termination.</u>

(a) The initial term of this agreement shall begin as of the date first above written and continue for two years from the date that the Fund commences operations, unless earlier terminated by either party as provided in this agreement. This agreement shall be renewed automatically for successive terms with one-year periods after the end of the initial term.

(b) This agreement may be terminated by either party at the conclusion of the then current term upon written notice of non-renewal to the other party not less than sixty (60) days prior to the end of the term. This agreement may be terminated at any time as follows: (i) by mutual written agreement of the parties; or (ii) for cause, by a party, in the event of willful misconduct, negligent conduct, bad faith or breach of this agreement by the other party, by giving not less than sixty (60) days' prior written notice to the other party, provided that, in the case of negligent conduct or breach of this agreement, such negligent conduct or breach shall remain un-remedied during the notice period.

(c) Upon termination of this agreement, the Manager and the Administrator agree to cooperate in good faith in transferring records and other information in the Administrator's possession and wrapping up their relationship under this agreement in a commercially reasonable manner. The Manager or the Fund shall pay to the Administrator such compensation as may be due (and not subject to good faith dispute) to the Administrator under

this agreement for services performed prior to the date of termination, including any reasonable out-of-pocket reimbursements due and payable.

(d) Upon termination of this agreement with respect to any Fund, the Administrator shall be entitled to be paid a wrapping up fee equal to the greater of (i) the compensation paid to the Administrator under this agreement for the one month immediately preceding the date of such termination or (ii) the Administrator's reasonable actual, documented expenses in wrapping up its services under this agreement, provided that the fee shall not exceed the compensation paid the Administrator under this agreement for the two months immediately preceding the date of such termination. The Administrator shall not be entitled to a fee in the event the Administrator elects to terminate this agreement or in the event the Administrator is terminated due to its negligent conduct or breach of this agreement.

10. <u>Amendment.</u> This agreement and its exhibits may be amended from time to time by mutual written agreement of the parties. If, at any time during the existence of this agreement, the Manager deems it necessary, advisable, or in the best interests of the Manager or the Fund that any amendment of this agreement be made in order to comply with the recommendations or requirements of the Securities and Exchange Commission, state regulatory agencies, or other governmental authority, or to obtain any advantage under state or federal laws, and the Manager notifies the Administrator of the form of amendment which it deems necessary or advisable and the reasons for such amendment, and if the Administrator declines to assent to such amendment, then the Fund may terminate this agreement upon sixty (60) days' prior written notice. Upon termination, the Administrator shall be entitled to the compensation set forth in Section 8 above.

11. <u>Notice.</u> All notices required or permitted under this agreement shall be in writing and shall be deemed received when delivered in person or by email or within three (3) days after being deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed as follows or to such other addresses as the parties may specify in writing:

(a) To Manager:    Innovative Capital Management
19762 MacArthur Blvd., 2nd Floor
Irvine, CA 92612
Attn: Scott Parent, CFA

  (c) To Administrator: The Nottingham Company
             116 South Franklin Street
             Rocky Mount, NC 27804
             Attn: Legal Department

12. <u>Delivery of Documents and Other Information.</u> The Manager or its designee shall provide the Administrator with the necessary documents, records, and other information to enable the Administrator to perform its duties and obligations under this agreement. In addition, the Manager shall endeavor to provide the Administrator with any amendments to, or other changes in, such documents, records, or other information in a reasonable time prior to such amendments or changes becoming effective.

  The Manager and the Administrator also agree to cooperate with each other in making necessary systems and software modifications to enable the Administrator to perform its duties and obligations under this agreement. Notwithstanding anything to the contrary in this agreement, the Manager and the Administrator each acknowledge and agree that their respective data processing systems and software shall remain the sole property of the Manager (or its designee) or the Administrator (or its designee), as the case may be.

  Exhibit C of this agreement is a list of persons authorized by the Manager and the Fund to execute this agreement and give any written or oral instructions, or written or oral specifications, by or on behalf of the Manager or the Fund. From time to time, the Manager may deliver a new Exhibit C to add or delete any person, and the Administrator shall be entitled to rely on the last Exhibit C actually received by the Administrator. The Administrator will be protected in acting on any document that it reasonably believes to be genuine and to have been signed or presented by the proper person or persons identified on Exhibit C.

13. <u>Definition of Business Day.</u> For purposes of this agreement, "business day" shall mean each business day the New York Stock Exchange is open for business.

14. <u>Compliance with Laws.</u> Each of the parties agrees to comply in all material respects with all the laws, rules, and regulations applicable to the operation of their respective businesses.

15. <u>Relationship of the Parties.</u> Except as otherwise provided in Section 7 of this agreement, the Administrator shall be providing all services under this agreement as an independent contractor. Nothing in this agreement shall be deemed or construed to create a partnership, franchise, joint venture, or a principal-agent or

employer-employee relationship between the parties, or to create any relationship other than that of an independent contractor.

16. <u>Construction.</u> This agreement shall be governed and enforced in accordance with the laws and judicial decisions of the State of North Carolina, notwithstanding the principles of conflicts of law. If any provision of this agreement shall be determined to be void or unenforceable by any court of competent jurisdiction, then such determination shall not affect any other provision of this agreement, all of which other provisions shall remain in full force and effect. If any provision of this agreement is capable of two interpretations, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning that renders it valid. In addition, the language used in this agreement shall be deemed the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against either party.

17. <u>Consent to Jurisdiction.</u> The parties consent to the jurisdiction of the North Carolina state and federal courts.

18. <u>Other.</u>

(a) This agreement and its exhibits constitute the entire agreement between the parties with respect to the subject matter of this agreement.

(b) This agreement may be executed in one or more counterparts, each of which when executed will be deemed an original, but the counterparts will together constitute one and the same instrument.

(c) This agreement, and the rights and obligations of the parties to this agreement, shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

*[Signatures on Following Page]*

IN WITNESS WHEREOF, the parties have caused this agreement to be signed by their duly authorized officers effective as of the date first indicated above.

**Innovative Fund 1 LP**
By: ~~Innovative Capital Management~~, its General Partner
Innovative Fund Partners

By: _Stt Parat_____

Name: Scott Parent, CFA

Title: _Managing member_____

**The Nottingham Company**

By: _____

Name: Katherine M. Honey

Title: Vice President

**Exhibit A**

LIST OF SERVICES

The Administrator shall provide, or cause to be provided by others, the following services for the Fund:

(1)   <u>Accounting Services:</u>

    (a)   For each valuation date of the Fund and consistent with written instructions from the Manager, obtain security prices from the Manager (or from standard pricing sources approved by the Manager) and apply those prices to the portfolio positions. It is understood and agreed that the Administrator shall have no responsibility or obligation to verify or question the accuracy of the security prices received or approved by the Manager. For purposes of this agreement, "valuation date" shall mean the last business day of each calendar month. Unless otherwise instructed by the Manager, security prices will be determined as of the time regular trading closes on the New York Stock Exchange.

    (b)   Identify interest and dividend accrual balances as of each valuation date and calculate gross earnings on investments for the accounting period.

    (c)   Determine gain/loss on security sales and identify them as to short- or long-term status.

    (d)   Account for periodic distributions of gain to the Fund and maintain undistributed gain or loss balances as of each valuation date.

(2)   <u>Expense Accrual and Payment Services:</u>

    (a)   For each valuation date of the Fund, calculate the expense accrual amounts as directed by the Manager as to methodology, rate, or dollar amount.

    (b)   Account for Fund expenditures and maintain expense accrual balances at the level of accounting detail specified by the Manager.

(3) <u>Valuation and Financial Reporting Services:</u>

    (a) Account for Fund subscriptions, sales, exchanges, transfers, dividend reinvestments, and other portfolio activity as reported by the Manager or the Fund on each valuation date.

    (b) Determine net investment income for the Fund as of each valuation date. Account for periodic distributions of earnings to the Fund and maintain undistributed net investment income balances as of each valuation date.

    (c) Maintain a general ledger for the Fund in a form reasonably prescribed by the Manager and produce a set of financial statements as may be agreed upon from time to time as of each valuation date.

    (d) For each valuation date, determine the net asset value of the Fund according to the accounting policies and procedures set forth by the Manager.

    (e) Calculate net asset value, net earnings, and other amounts with respect to each investor's capital account in the Fund reflective of the Fund's operation as of each valuation date and at such times as required by the nature and characteristics of the Fund.

    (f) Prepare standard performance calculations in a manner and form to be mutually agreed upon.

    (g) Support financial statement preparation by making the fund accounting records of the Fund in the Administrator's possession available to the Manager and the outside auditors of the Manager or the Fund.

(4) <u>Registration Assistance:</u>

    (a) Assist legal counsel of the Manager or the Fund, as may be requested, by making available to legal counsel such information in the Administrator's possession as may be necessary for the preparation of certain reports and filings required to maintain the registration and qualification of the Fund under federal and state securities laws, provided, however, the Administrator shall not be responsible for filing such reports, filings, or registrations.

(5) <u>Investor Recordkeeping and Servicing Services:</u>

    (a) Process subscriptions, both initial and subsequent, in accordance with conditions set forth by the Manager, reviewing each subscription agreement to ensure that it has been fully and properly completed and, if not so completed, contacting the Manager to gather missing information needed to complete the agreement.

    (b) Transfer limited partnership interests to an existing account or to a new account upon receipt of required documentation in good order.

    (c) Distribute dividends and capital gain distributions (including disbursements as cash or reinvestment) and change the disbursement option at the request of the Manager.

    (d) Process and direct subscriptions/withdrawals and initiate new account or process to existing account as directed by the Manager.

    (e) Make miscellaneous changes to records, including, but not necessarily limited to, address changes as directed by the Manager.

    (f) Prepare and maintain a year-to-date confirmation and statement as each transaction is recorded in the Fund's account.

    (g) If appropriate, handle normal and customary telephone calls and correspondence in reply to Fund requests except those items otherwise set forth in this agreement.

    (h) Verify that all prospective members are not designated nationals and/or blocked persons as identified on the OFAC list maintained by the U.S. Department of Treasury (http://www.treas.gov.ofac)

**Exhibit B**

COMPENSATION SCHEDULE

For the services described in this agreement, the Administrator shall be compensated and paid by the Fund the fees and expenses specified below. Compensation will be calculated in arrears, based on the net asset value of the Fund on each valuation date, in accordance with the schedule below, and paid to the Administrator monthly. As stated in Section 6 of this agreement, the Administrator shall calculate the compensation to which it is entitled under this agreement and direct the disbursement of such compensation from the Fund.

All reimbursement of actual out-of-pocket expenses due the Administrator under this agreement, including, but not limited to, monthly non-interest bearing commercial checking fees for the Fund, shall be promptly paid to the Administrator upon receipt of a statement from the Administrator.

Notwithstanding the fact that this agreement may become effective subsequent to the first day of the month or terminate before the last day of the month, the Administrator's compensation for any month in which this agreement is in effect shall be based on the fees and expenses specified below and not prorated or otherwise reduced should the agreement only be in effect for part of a month.

This exhibit may be amended or replaced in its entirety pursuant to the provisions set forth in Section 8 and Section 9 of this agreement.

The annual asset-based fee for the Fund shall be based on the net asset value of the Fund at the following rates:

(a) 0.10% on the first $100 million in assets, subject to a minimum of $1,500 per month for the first six months, and $2,500 per month thereafter;

(b) 0.08% on assets over $100 million;

(c) 0.06% on assets over $200 million.

The Fund shall also pay an Audit & Tax coordination fee of $5,000.00 annually. This fee shall be waived for the first year.

**Technology Projects**

The Fund may, from time to time, request that the Administrator create or aid in the creation of specialized reports, databases, or other customized

digital products. These may include, but are not limited to, additional data displayed for the Fund's manager or members on its web portal.

Each such project will be invoiced at a rate of $500 plus $150 per hour (beyond the first 3) worked by the Administrator's programming staff.

**Exhibit C**

LIST OF AUTHORIZED PERSONS

The following individuals serve in the following positions with the Manager or the Fund, and each has been duly elected or appointed to each such position and the signatures set forth opposite their respective names are their true and correct signature. Each such person is authorized to give written (including, without limitation, written email) or oral instructions or written (including, without limitation, written email) or oral specifications by or on behalf of the Manager or the Fund to the Administrator.

| Name | Position | Signature |
|------|----------|-----------|
| <u>Scott Parent, CFA</u> | Managing member | |

# EXHIBIT F

# Sanville & Company
### CERTIFIED PUBLIC ACCOUNTANTS

ROBERT F. SANVILLE, CPA
MICHAEL T. BARANOWSKY, CPA
JOHN P. TOWNSEND, CPA

1514 OLD YORK ROAD  ABINGTON, PA  19001
(215) 884-8460 • (215) 884-8686 FAX

MEMBERS OF
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS
PENNSYLVANIA INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

17 BATTERY PLACE, 11th FLOOR
NEW YORK, NY 10178
(212) 709-9512

December 7, 2016

Mr. Scott Parent
General Partner
Innovative Fund, LP
19762 MacArthur Blvd.
Second Floor
Irvine, CA 92612

Dear Mr. Parent,

We are pleased to confirm our understanding of the services we are to provide to Innovative Fund 1, LP (the Partnership) for the year ended December 31, 2016.

We understand the professional services to be rendered are as follows:

We will audit the Partnership's statement of assets, liabilities and partners' capital, including the schedule of investments as of December 31, 2016, and the related statements of operations and changes in partners' capital for the year then ended, and the related notes to the financial statements.

We will also prepare the related federal, state, and local partnership income tax returns (including Partner K-1s) for the year ended December 31, 2016.

*Audit Objective*
The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles. Our audit will be conducted in accordance with auditing standards generally accepted in the United States of America and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion.  We will issue a written report upon completion of our audit of the Partnership's financial statements. Our report will be addressed to the partners of the Partnership. We cannot provide assurance that an unmodified opinion will be expressed. Circumstances may arise in which it is necessary for us to modify our opinion or add an emphasis-of-matter or other-matter paragraph. If our opinion is other than unmodified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

*Audit Procedures*

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors and financial institutions. We will also request written representations from your attorneys as part of the engagement, and they may bill you for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Partnership or to acts by management or employees acting on behalf of the Partnership.

Because of the inherent limitations of an audit, combined with the inherent limitations of internal control, and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us, even though the audit is properly planned and performed in accordance with US generally accepted auditing standards. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform the appropriate level of management of any material errors, fraudulent financial reporting, or misappropriation of assets that comes to our attention. We will also inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditor is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

The audit documentation for this engagement is the property of Sanville & Company and constitutes confidential information. However, we may be requested to make certain audit documentation available to the Securities and Exchange Commission (SEC) pursuant to authority given to it by law or regulation. If requested, access to such audit documentation will be provided under the supervision of Sanville and Company personnel. Furthermore, upon request, we may provide copies of selected audit documentation to the SEC. The SEC may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies.

*Management Responsibilities*

You agree to assume all management responsibilities for the tax services and any other non-attest services we provide; oversee the services by designating an individual, preferably from senior management, with suitable skill, knowledge, or experience; evaluate the adequacy and results of the services; and accept responsibility for them.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the preparation and fair presentation of the financial statements in conformity with U.S. generally accepted accounting principles. You are also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. You are also responsible for providing us with (1) access to all information of which you are aware that is relevant to the preparation and fair presentation of the financial statements, (2) additional information that we may request for the purpose of the audit, and (3) unrestricted access to persons within the company from whom we determine it necessary to obtain audit evidence.

Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the company involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the Partnership received in communications from employees, former employees, regulators, or others. In addition, you are responsible for identifying and ensuring that the entity complies with applicable laws and regulations.

### Other Services
We will prepare the Partnership's federal, state and local tax returns (including Partner K-1s) for the year ended December 31, 2016. We will perform the services in accordance with applicable professional standards, including the Statements on Standards for Tax Services issued by the American Institute of Certified Public Accountants. The other services are limited to the financial statement and tax services previously defined. We, in our sole professional judgement, reserve the right to refuse to perform any procedure or take any action that could be construed as assuming management responsibilities. We will advise management with regard to tax positions taken in the preparation of the tax return, but management must make all decisions with regard to those matters.

### Engagement Administration, Fees, and Other
Michael T. Baranowsky is the engagement partner and is responsible for supervising the engagement and signing the report.

Based on our experience in the industry, we estimate the fees for these services to range from $9,000 to $11,000. We also would request to be reimbursed for travel and other out-of-pocket expenses. Should any situation arise that would materially increase this estimate, we will, of course, advice you.

Whenever possible, we will attempt to use your company's personnel. This effort could substantially reduce our time requirements and help you hold down audit fees.

During the course of our engagement, we may observe opportunities for economy in, or improved controls over, your operations. We will bring such matters to the attention of the appropriate level of management whether orally or in writing.

If you intend to publish or otherwise reproduce the financial statements and make reference to our firm, you agree to provide us with printer's proofs or masters for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

We appreciate your confidence in retaining us as your certified public accountants and look forward to working with you and your staff.

Very truly yours,

*Lanvell & Company*

Accepted by: *Scott Parent*

Title: *Managing Member*

Date: *12/7/16*

ROBERT F. SANVILLE, CPA
MICHAEL T. BARANOWSKY, CPA
JOHN P. TOWNSEND, CPA

# *Sanville & Company*
## CERTIFIED PUBLIC ACCOUNTANTS

1514 OLD YORK ROAD  ABINGTON, PA  19001
(215) 884-8460 • (215) 884-8686 FAX

MEMBERS OF
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS
PENNSYLVANIA INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

17 BATTERY PLACE, 11th FLOOR
NEW YORK, NY 10178
(212) 709-9512

---

December 7, 2016

Mr. Scott Parent
General Partner
Innovative Fund 1, LP
19762 MacArthur Blvd.
Second Floor
Irvine, CA 92612

Dear Mr. Parent,

We are pleased to confirm our understanding of the services we are to provide to Innovative Funds (the Partnerships) for the year ended December 31, 2017.

We understand the professional services to be rendered are as follows:

### *Innovative Fund 1, LP (the "Master Fund")*

We will audit the Master Fund's statement of assets, liabilities and partners' capital, including the schedule of investments as of December 31, 2017, and the related statements of operations and changes in partners' capital for the year then ended, and the related notes to the financial statements.

We will also prepare the Master Fund's related federal, state, and local partnership income tax returns (including Partner K-1s) for the year ended December 31, 2017.

### *Innovative Fund International Ltd. A British Virgin Islands Business Company (the "Feeder Fund")*

We will audit the Feeder Fund's statement of assets, liabilities and partners' capital, including the schedule of investments as of December 31, 2017, and the related statements of operations and changes in partners' capital for the year then ended, and the related notes to the financial statements.

### *Audit Objective*
The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles. Our audit will be conducted in accordance with auditing standards generally accepted in the United States of America and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion.  We will issue a written report upon completion of our audit of the Partnership's financial statements. Our report will be addressed to the partners of the Partnership. We cannot provide assurance that an unmodified opinion will be expressed. Circumstances may arise in which it is necessary for us to modify our opinion or add an emphasis-of-matter or other-matter paragraph. If our opinion is other than unmodified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

### *Audit Procedures*

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors and financial institutions. We will also request written representations from your attorneys as part of the engagement, and they may bill you for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Partnership or to acts by management or employees acting on behalf of the Partnership.

Because of the inherent limitations of an audit, combined with the inherent limitations of internal control, and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us, even though the audit is properly planned and performed in accordance with US generally accepted auditing standards. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform the appropriate level of management of any material errors, fraudulent financial reporting, or misappropriation of assets that comes to our attention. We will also inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditor is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

The audit documentation for this engagement is the property of Sanville & Company and constitutes confidential information. However, we may be requested to make certain audit documentation available to the Securities and Exchange Commission (SEC) pursuant to authority given to it by law or regulation. If requested, access to such audit documentation will be provided under the supervision of Sanville and Company personnel. Furthermore, upon request, we may provide copies of selected audit documentation to the SEC. The SEC may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies.

### *Management Responsibilities*

You agree to assume all management responsibilities for the tax services and any other non-attest services we provide; oversee the services by designating an individual, preferably from senior management, with suitable skill, knowledge, or experience; evaluate the adequacy and results of the services; and accept responsibility for them.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the preparation and fair presentation of the financial statements in conformity with U.S. generally accepted accounting principles. You are also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. You are also responsible for providing us with (1) access to all information of which you are aware that is relevant to the preparation and fair presentation of the financial statements, (2) additional information that we may request for the purpose of the audit, and (3) unrestricted access to persons within the company from whom we determine it necessary to obtain audit evidence.

Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the company involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the Partnership received in communications from employees, former employees, regulators, or others. In addition, you are responsible for identifying and ensuring that the entity complies with applicable laws and regulations.

### Other Services

We will prepare the Partnership's federal, state and local tax returns (including Partner K-1s) for the year ended December 31, 2016. We will perform the services in accordance with applicable professional standards, including the Statements on Standards for Tax Services issued by the American Institute of Certified Public Accountants. The other services are limited to the financial statement and tax services previously defined. We, in our sole professional judgement, reserve the right to refuse to perform any procedure or take any action that could be construed as assuming management responsibilities. We will advise management with regard to tax positions taken in the preparation of the tax return, but management must make all decisions with regard to those matters.

### Engagement Administration, Fees, and Other

Michael T. Baranowsky is the engagement partner and is responsible for supervising the engagement and signing the report.

We estimate the fees for these services to range from $16,000 to $18,000 for up to 25 partners and $19,000 to $21,000 for 25 to 50 partners. We also would request to be reimbursed for travel and other out-of-pocket expenses. Should any situation arise that would materially increase this estimate, we will, of course, advice you.

Whenever possible, we will attempt to use your company's personnel. This effort could substantially reduce our time requirements and help you hold down audit fees.

During the course of our engagement, we may observe opportunities for economy in, or improved controls over, your operations. We will bring such matters to the attention of the appropriate level of management whether orally or in writing.

If you intend to publish or otherwise reproduce the financial statements and make reference to our firm, you agree to provide us with printer's proofs or masters for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

We appreciate your confidence in retaining us as your certified public accountants and look forward to working with you and your staff.

Very truly yours,

Accepted by: _____

Title: _____

Date: _____